## Norfolk

JOHN DAVID BECK

v.

COMMONWEALTH OF VIRGINIA

No. 0086-85

Decided April 15, 1986

COUNSEL

David G. Wittan (Fox, Wittan and Reiss, P.C., on brief), for appellant.

Marla Lynn Graff, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—John David Beck (appellant) appeals from the January 4, 1985 trial court judgment which convicted him of first-degree murder in connection with the December 14, 1983 killing of Marie Mustain (decedent), age 73. The trial court sentenced appellant to life imprisonment. The conviction followed a November 19, 1984 trial by the court without a jury. In addition to the murder charge, appellant was found guilty of related charges of grand larceny, check forgery and the uttering of forged checks.

This appeal relates exclusively to the murder conviction. Appellant maintains that the Commonwealth's evidence was insufficient to identify him as the criminal agent in decedent's death and failed to show the premeditation necessary to elevate the homicide to first-degree murder.

On appeal we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Evans* v. *Commonwealth,* 215 Va. 609, 612, 212 S.E.2d 268, 271 (1975). The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict, and will not be disturbed on appeal unless plainly wrong or without evidence to support it. Code § 8.01-680; *Evans* v. *Commonwealth,* 215 Va. at 613, 212 S.E.2d at 271; *see also Stockton* v. *Commonwealth,* 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied,* 469 U.S. 873 (1984); *Gooden* v. *Commonwealth,* 226 Va. 565, 572, 311 S.E.2d 780, 784 (1984).

I.

On Friday, December 16, 1983, at approximately 1:00 a.m., Curtis Ray Brooks, Fred Burleson, and Kenneth Smith discovered decedent's body in her bedroom at her Newport News home. She lay under the wrinkled covers of the bed with two pillows positioned close to her face. All three men knew appellant. Burleson, Smith and appellant rented separate rooms from decedent in her home. When decedent's body was discovered, the three men noted that she was not breathing. They immediately contacted the Newport News police. Upon their arrival, the police confirmed her death and contacted the medical examiner's office. The police found no sign of forced entry into decedent's house.

A forensic pathologist, Dr. Faruk Presswalla, examined her body that morning, and at the trial stated her cause of death "as a result of mechanical asphyxia, manual strangulation and additional suffocation or smothering." The latter finding was based upon the location of the pillows found around her head upon discovery of the body.

Dr. Presswalla noted bruising on the left undersurface of decedent's chin, behind her left ear over the mastoid bone, in the muscles of her neck and in the muscles of the base of the tongue on

the floor of her mouth. The cartilage of her larynx was fractured, which, along with the bruising, was consistent with the squeezing of her neck area by hands with fingers pressed into localized areas. Additional bruising, consistent with pressure from a hand, elbow or knee, appeared around her ribs and the tip of her left shoulder.

Blood "congested" her face, which, along with the undersides of her eyelids, was "petechial," that is, showing pinhead size hemorrhages "indicative of pressure around the neck which results in the blood flow from the face and neck being obstructed." Dr. Presswalla noted from internal bodily changes that decedent died 36 hours to 48 hours or "a little over" prior to his examination on December 16. He concluded that she died either Tuesday, December 13, or Wednesday, December 14, and that she was not alive on Thursday, December 15, 1983.

Fred Burleson testified that he met appellant in November 1983 as a co-worker in a local grocery store and that appellant had quit that employment about one week before decedent's death. During the time they worked together Burleson befriended appellant and introduced him to decedent, who accepted appellant as a tenant.

Burleson, in whom decedent confided her personal and financial matters, stated that he last saw her alive on Monday, December 12, 1983. He further testified that decedent owned a Plymouth K-car and added that she never loaned her car or money to anyone, including boarders. He did not see decedent's car after that Monday.

During the week of December 12, Burleson collected decedent's mail. When the mail went untouched he commented to appellant on her unusual absence. Appellant responded by telling Burleson that she had gone to visit and stay with a niece in the Denbigh section of Newport News. Burleson's testimony further disclosed that appellant had failed to pay the rent due decedent and that she had instructed him to move from her home.

On Tuesday, December 13, at approximately 4:00 a.m., appellant had entertained "rowdy" guests in decedent's home. As a result, Burleson asked appellant to remove these guests because "Mrs. Mustain didn't allow that."

Shortly after midnight on Friday, December 16, Curtis Ray Brooks came to decedent's home looking for appellant. Burleson was the first to see Brooks. They checked appellant's room, and found that all of appellant's belongings had been removed. A discussion followed which included decedent's third tenant, Kenneth Smith. The three men decided to check decedent's locked bedroom. It was during this check that they discovered her body.

Curtis Ray Brooks, who had known appellant for two years, testified that appellant had visited Brooks' work place on the afternoon of Thursday, December 15, 1983. Appellant was driving a Plymouth K-car which he stated belonged to him. The automobile was damaged, and appellant requested that Brooks follow him to a local garage to leave the car for repair. Brooks agreed and, after dropping off the automobile, brought appellant back to Brooks' work place. There, appellant asked to borrow Brooks' car for a short period and Brooks agreed. When he failed to return the car that day, Brooks reported it stolen. After work, Brooks searched for appellant, eventually arriving at decedent's home. It was Brooks's discoveries that appellant had vacated his room and that the K-car belonged to decedent which led him, Burleson and Smith to force open decedent's bedroom door. It was later discovered that the appellant had left Virginia for Georgia where he was later arrested in possession of Brooks' vehicle.

Kenneth Smith told the trial court that on Wednesday, December 14, he noticed that his leather blazer was missing from his bedroom closet. The blazer was recovered in appellant's possession upon his April 1984 arrest in Union City, Georgia. Smith, who had been absent from decedent's home during the preceding weekend, did not see her during the week of her death, and last saw her K-car on Tuesday or Wednesday, December 13 or 14. Smith testified that he never knew decedent to lend her car to any person.

Mecie Woodard, a neighbor and friend of decedent since 1963, did not see decedent or her car after Monday, December 12. Ordinarily, Woodard communicated with her daily, but no contact occurred that week. Woodard also testified that decedent would not lend her car to anyone.

Dixie Lee Hoke and Diane Hoaglin were decedent's nieces. They testified that neither communicated with decedent after

Sunday, December 11. Both women testified that they did not live in Denbigh prior to or during the week of decedent's death. Hoaglin testified that, to the best of her knowledge, decedent did not lend her car to anyone.

On December 16, the Newport News police recovered decedent's K-car at the garage where appellant left it. The garage manager testified that appellant failed to return for the car or to telephone him regarding a repair estimate.

At the trial, the Commonwealth established through bank personnel, bank photographs, fingerprint analysis and forensic handwriting analysis that on December 13 and 14, appellant cashed four checks totaling approximately $1,000 drawn upon decedent's account and naming him as payee. On each check, the decedent's signature as maker was forged. On the face of the checks appeared the words "paint," "painting" or "landscaping." The evidence disclosed that appellant performed no such work at decedent's home. It further disclosed that the appellant was seen at a tavern on the night of December 14, and then possessed "a wad of money."

Finally, the parties stipulated the following facts: that the state forensic laboratory analyzed a seminal stain found on the quilt covering decedent's body; that the fluid creating the stain contained type A secretions; that blood and bodily fluid testing on appellant established that he has type A blood; and that he is a type A secretor in his bodily fluids.

## II.

The Commonwealth proved its case by wholly circumstantial evidence. The general rule to be applied in such cases has been stated in several Supreme Court of Virginia decisions. *See Inge* v. *Commonwealth,* 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976); *Boykins* v. *Commonwealth,* 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969); *Abdell* v. *Commonwealth,* 173 Va. 458, 470, 2 S.E.2d 293, 298 (1939); *Dean* v. *Commonwealth,* 73 Va. (32 Gratt.) 912, 926 (1897).

The applicable principles of law are well settled. When the evidence is wholly circumstantial, as here, all necessary circumstances proved must be consistent with guilt and incon-

sistent with innocence and exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. Nevertheless, it is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts. The burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime.

*Inge* v. *Commonwealth,* 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976) (citation omitted).

Here, the Commonwealth presented reliable evidence on each factor enumerated in *Inge.* While no single inculpatory fact, standing alone, marks appellant as the criminal agent in Mrs. Mustain's death, consideration of the facts in totality exhausts all reasonable theories of his innocence. The inference of his guilt was compelling, reasonable and justified. *Epperly* v. *Commonwealth,* 224 Va. 214, 228, 294 S.E.2d 882, 890 (1982); *see also Stamper* v. *Commonwealth,* 220 Va. 260, 272-73, 257 S.E.2d 808, 817-18 (1979), *cert. denied,* 445 U.S. 972 (1980).

We find, therefore, that the Commonwealth presented sufficient evidence from which the trial court could reasonably have found that appellant killed the decedent.

As with the criminal agency issue, the trial court considered circumstantial evidence to determine that appellant committed a willful, deliberate and premeditated homicide. In finding first-degree murder, the fact finder need not have found that Beck harbored the intent to kill for any particular time prior to its enactment. *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980). The intent to kill may arise prior to or at the time of the murder; "[i]t is the will and purpose to kill, not necessarily the interval of time, which will determine the grade of the offense." *Akers* v. *Commonwealth,* 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975).

Furthermore, the trial court properly considered, as evidence of premeditation, the manner of death as well as the circumstances surrounding the decedent's death. The fact that the decedent died from manual strangulation and suffocation, which

in themselves required some prolonged physical effort by appellant, coupled with the same facts which identified Beck as the criminal agent, were relevant to the determination whether Beck acted willfully, deliberately and with premeditation. *See Clozza* v. *Commonwealth,* 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), *cert. denied,* 469 U.S. 1230 (1985). We find this evidence ample to support the trial court's finding of first-degree murder.

Accordingly, finding no error in the judgment appealed from, that judgment is affirmed.

*Affirmed.*

Barrow, J., and Hodges, J., concurred.