Norfolk

REGINALD SHELL

v.

COMMONWEALTH OF VIRGINIA

No. 1386-89-1

Decided October 30, 1990

COUNSEL

Lawrence A. Martin, for appellant.

Thomas C. Daniel, Assistant Attorney General, (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.**—In a bench trial on June 30, 1989, Reginald Shell was convicted of first-degree murder and sentenced to sixty years imprisonment under Code §§ 18.2-32 and 18.2-10(b). In this appeal, Shell raises the following issues: (1) whether the trial court improperly found Shell made a knowing and voluntary waiver of his constitutional rights and thus erroneously admitted his confession into evidence; (2) whether the evidence was sufficient for the trial court to have found the element of premeditation necessary for a first-degree murder conviction. For the reasons that follow, we affirm Shell's conviction.

On February 11, 1989, police found the body of Samuel Rylander in a house at 105 Victor Street in Hampton. Rylander's feet were tied with electrical cord and a clothes hanger was wrapped around his neck. There were numerous stab wounds and lacerations about his head and body along with two knives implanted in his neck and one in his back. On February 16, 1989, Reginald Shell, the victim's son, turned himself in to Newport News police for an unrelated offense. Between about 8:30 and 10:30 in the morning, Newport News detectives interrogated Shell about the unrelated offense. At least twice prior to questioning, the Newport News detectives gave Shell *Miranda* rights warnings, for which they later obtained a statement signed by Shell acknowledging being informed of those rights. During that initial interrogation, the detectives and Shell took several breaks of no more than five minutes.

Meanwhile, Hampton detectives arrived at the police station to question Shell about the murder of his father. Outside of Shell's presence, the Newport News detectives told the Hampton detectives that Shell had been advised twice of his *Miranda* rights and that the warnings were on tape. About ten minutes after the Newport News detectives finished questioning Shell, the Hampton detectives began a fifteen minute interview with him. Shell cooperated and expressed no unwillingness to talk. He told the detectives that he killed his father because his father called Shell's mother a "whore" and told him he was illegitimate. Shell stated,

"I went off. I began kicking and kicking, and I hit him with a pipe. I was stomping him . . . . I had my boots on. I hit him in the head with a green lamp or something and a speaker. I also hit him in the head with a pipe like a table leg." During that time, according to Shell, Rylander attempted to get up but Shell stabbed him with one knife and then got another knife before tying up his father with wire and electric cord. At the conclusion of his confession to the Hampton detectives, Shell signed a written statement declaring his confession was made of his own free will after being advised of his constitutional rights. Shell's bloody fingerprint was found at the crime scene. In addition, Larry Ward, a convicted felon and cellmate of Shell, testified that Shell told him that he killed his father during an argument as described to the detectives.

I.

The first issue Shell raises on appeal is whether the trial court erred in refusing to suppress his confession to the Hampton detectives since they did not re-advise him of his *Miranda* rights before interrogating him. Without citing any authority to support his position, Shell argues that he could not have made a knowing and intelligent waiver of his constitutional rights concerning the Hampton murder charge because the Hampton detectives did not re-advise him of his *Miranda* rights but rather relied upon the prior warnings given to him by the Newport News detectives. Implicit in this position is that *Miranda* warnings are charge specific. We disagree.

We begin our review of Shell's assertions under familiar principles. In order for a confession to be admissible, the Commonwealth bears the burden of proving the defendant voluntarily made a knowing and intelligent waiver of his constitutional privilege against self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966); *Smith v. Commonwealth*, 7 Va. App. 310, 314, 373 S.E.2d 340, 342 (1988); *Goodwin v. Commonwealth*, 3 Va. App. 249, 252, 349 S.E.2d 161, 163 (1986). Therefore, the Commonwealth first must show that the police complied with the necessary procedural safeguards by advising the defendant of his *Miranda* rights. *See Blain v. Commonwealth*, 7 Va. App. 10, 13, 371 S.E.2d 838, 840 (1988). "Failure to give *Miranda* warnings prior to custodial interrogation requires sup-

pression of any illegally obtained statements." *Id.*

■ The *Miranda* warnings protect a suspect's constitutional privilege by "ensuring that a suspect knows that he may choose not to talk to law enforcement officials, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him." *Colorado v. Spring,* 479 U.S. 564, 574 (1987). Furthermore, "[t]he purposes of the safeguards prescribed by *Miranda* are to *ensure* that the police do not coerce or trick captive suspects into confessing . . . and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary." *May v. Commonwealth,* 3 Va. App. 348, 354-55, 349 S.E.2d 428, 431 (1986).

■ While the trial judge has the duty to determine from the evidence that a confession was freely and voluntarily given before admitting it into evidence, *Jefferson v. Commonwealth,* 6 Va. App. 421, 424-25, 369 S.E.2d 212, 214 (1988), on appeal the issue of voluntariness is a question of law subject to the court's independent review of the entire record. *Miller v. Fenton,* 474 U.S. 104, 110-11 (1985); *Kauffmann v. Commonwealth,* 8 Va. App. 400, 405, 382 S.E.2d 279, 281 (1989). However, the trial court's subsidiary factual findings, upon which voluntariness is determined, are entitled to the same weight as facts found by a jury and will not be disturbed on appeal unless plainly wrong. *Williams v. Commonwealth,* 234 Va. 168, 172, 360 S.E.2d 361, 364 (1987), *cert. denied,* 484 U.S. 1020 (1988); *Smith v. Commonwealth,* 7 Va. App. 310, 314, 373 S.E.2d 340, 342-43 (1988).

■ In *Frye v. Commonwealth,* the defendant was arrested in West Virginia for the murder of a Virginia state policeman and taken to a West Virginia fire station for questioning. He was read his *Miranda* rights before he waived them and denied committing the murder. The interrogation stopped for a short while and then resumed, at which time the defendant confessed to the murder. On appeal, the defendant argued that his confession should have been excluded from trial since the police failed to rewarn him of his *Miranda* rights before resuming the interrogation. The Supreme Court of Virginia held that "[w]here a defendant has re-

ceived *Miranda* warnings and has given a knowing and intelligent waiver of his constitutional rights, the waiver is presumed to continue through subsequent interrogations until he manifests a desire to revoke it." 231 Va. 370, 378, 345 S.E.2d 267, 274 (1986)(citing *Washington v. Commonwealth*, 228 Va. 535, 548, 323 S.E.2d 577, 586 (1984), *cert. denied*, 471 U.S. 1111 (1985)).

In *Washington*, the defendant was arrested in Fauquier County on charges unrelated to an unsolved murder that occurred nearly a year earlier in the town of Culpeper. After reading the defendant the *Miranda* warnings, Fauquier investigators questioned him about the crime for which he was arrested and then asked him about the Culpeper murder to which he made a vague confession. The next day, Culpeper and state investigators read him *Miranda* rights and extracted a more complete confession and a signed statement from the defendant. Later, after stopping for lunch but without being rewarned of his *Miranda* rights, the defendant took the police to retrace his actions from the murder. On appeal, the defendant unsuccessfully sought to have evidence derived from the retracing of his actions declared inadmissible since he was not reread his *Miranda* rights. The Court held that there was no need for the police to have rewarned the defendant since he already made a valid waiver of his rights and had not reasonably manifested a desire to revoke his waiver. 228 Va. at 548-49, 323 S.E.2d at 586.

Virginia is not alone in holding repeated *Miranda* warnings are not mandatory once an accused has waived his rights. *See Biddy v. Diamond*, 516 F.2d 118 (5th Cir. 1975), *cert. denied*, 425 U.S. 950 (1976); *see also United States v. Anthony*, 474 F.2d 770 (5th Cir. 1973) ("there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them"); *United States ex rel. Henne v. Fike*, 563 F.2d 809 (7th Cir. 1977), *cert. denied*, 434 U.S. 1072 (1978) (fresh warnings not required after passage of a few hours).

In the present appeal both parties cite *Colorado v. Spring*, 479 U.S. 564 (1987), where agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) arrested a defendant in Kansas City, Missouri for firearms violations. After advising him of his *Miranda* rights, the agents transferred the defendant to the ATF office, where the defendant was again advised of his rights. Despite the two warnings, he signed a statement waiving his rights

and declaring his willingness to answer questions. The interview began with questions about firearms transactions but eventually turned to questions concerning the defendant's criminal record and whether he ever had shot anyone. The defendant admitted to having shot people before but reluctantly denied being involved with an unreported homicide in Colorado. Two months later, Colorado law enforcement officials conducted an interview with the defendant in which he was given his *Miranda* rights and again signed a waiver before confessing to the Colorado homicide.

■ On appeal, the defendant argued that his waiver of *Miranda* rights was invalid because "he was not informed that he would be questioned about the Colorado murder." *Id.* at 569. After first re-affirming the rule that a person may waive his Fifth Amendment privilege only if he does so voluntarily, knowingly, and intelligently, the United States Supreme Court rejected the defendant's argument. The Court weighed heavily the facts that the defendant was read his *Miranda* rights, indicated he understood his rights and signed a waiver, and that there was no evidence of physical or mental coercion by the officials. The Court stated the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege" against self-incrimination. *Id.* at 574 (citations omitted). Furthermore, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might affec[t] his decision to confess.'" *Id.* at 576 (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)). Such information would "affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577. In conclusion, the Court held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.*

With these principles in mind, we turn to the facts before us to determine whether the Hampton detectives violated Shell's right in questioning him without first re-advising him of his *Miranda* rights. On this record, there are three factors to which Shell points to establish his claim of a constitutional violation. First, a ten minute lapse occurred between the end of his first interview,

during which he was given at least two *Miranda* warnings, and the second interview, during which he was not given a *Miranda* warning. Second, he was not forewarned of the topic of the second interview. Third, he was not informed until the end of the first interview that detectives from another jurisdiction were there to ask him questions. While each of these factors clearly mark a change in circumstances from the first interview to the second interview, we find that none of these factors, individually or in combination, required the Hampton detectives to re-advise Shell of his *Miranda* rights prior to questioning him about the murder of his father.

Shell does not dispute the testimony of the Newport News detectives that he was advised of his *Miranda* rights at least twice before beginning the first interview at about 8:30 in the morning. Furthermore, Shell later signed a waiver form indicating he understood the *Miranda* rights given to him that morning. At that point, Shell made a valid waiver of his constitutional rights according to *Miranda*. Therefore, the question is whether that waiver terminated either on its own or by an indication from Shell.

■ When a suspect voluntarily makes a knowing and intelligent waiver of his constitutional rights, that waiver remains valid through subsequent interviews until the suspect manifests a desire to revoke it. *Frye*, 231 Va. at 378, 345 S.E.2d at 274. The interview with the Newport News detectives lasted approximately two hours. During that interview, the detectives and Shell took several short breaks lasting about five minutes or less. Shell never indicated a desire to withdraw his waiver during the first interview or the breaks, and he does not assert on appeal that new *Miranda* warnings were required after each break. At the conclusion of the first interview, the Newport News detectives informed Shell that they were through questioning him and that the Hampton detectives were there to ask him questions.

After a slightly longer break of about ten minutes, the Hampton detectives began interviewing Shell. The second interview lasted about fifteen minutes, during which time Shell never manifested an unwillingness to talk to the Hampton detectives. Instead, he was cooperative and openly discussed the murder of his father. Therefore, we find the mere ten minute lapse of time between the interviews, absent any indication by Shell of an unwillingness to

talk, did not automatically terminate his earlier waiver or constitute a requirement for renewed *Miranda* warnings.

■ Shell was unaware of all the possible subjects of questioning before he was advised and waived his *Miranda* rights. *Colorado v. Spring* holds that a suspect's knowledge of the subject matter of the investigation is not relevant in determining whether a suspect made a valid waiver of his constitutional rights. 479 U.S. at 577. Consequently, the fact Shell was not informed he would be questioned about the murder of his father prior to waiving his constitutional rights did not negate his otherwise valid waiver or his confession.

■ Finally, at the time of the waiver, Shell did not know that detectives from a different jurisdiction would be questioning him. We do not believe that a suspect's lack of information regarding the jurisdiction of all his interviewers is any more significant than a suspect's lack of information concerning the topics of an interview. Therefore, we hold that Shell's otherwise valid waiver was not rendered constitutionally defective merely because he was not forewarned that Hampton detectives, in addition to Newport News detectives, would question him.

The record clearly indicates that before being questioned, Shell was provided with all the information necessary for making an intelligent and knowing waiver. The detectives did not mentally or physically coerce or trick Shell into waiving his rights; he did so voluntarily. He never manifested a desire to stop talking to the detectives from Newport News or Hampton. Furthermore, Shell signed statements acknowledging that he had been advised of his rights and that he confessed on his own free will. The record clearly supports the trial court's finding that the confession was admissible.

In summary, we hold that when a suspect has been properly advised of his *Miranda* rights and has made a voluntary waiver of those rights, absent an affirmative showing of a withdrawal of that waiver it is illogical to conclude that the person being interrogated does not continue to waive those rights ten minutes later simply because the subject of interrogation and the person conducting the interrogation change.

## II.

Shell also argues on appeal that the evidence was insufficient for the trial court to find that his father's murder was premeditated. He asserts that the evidence of his rage and the events giving rise to the murder are more consistent with second degree murder or manslaughter and negate the premeditation required for a first degree murder conviction.

■■■ "When considering the sufficiency of the evidence on appeal of a criminal conviction, we view the evidence in the light most favorable to the Commonwealth and accord to it all reasonable inferences deducible therefrom." *Glenn v. Commonwealth*, 10 Va. App. 150, 153, 390 S.E.2d 505, 507 (1990). Absent evidence the decision is "plainly wrong" or without support, we will uphold the conviction. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975); *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988).

■■■ Despite Shell's assertion that he was enraged by his father's comments and "went off," there is ample evidence to support the trial court's finding of premeditation. "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano v. Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 99 (1980). Thus "[t]he intent to kill may arise . . . at the time of the murder; '[i]t is the will and purpose to kill, not necessarily the interval of time, which will determine the grade of the offense.'" *Beck v. Commonwealth*, 2 Va. App. 170, 176, 342 S.E.2d 642, 646 (1986) (quoting *Akers v. Commonwealth*, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975)).

By his own admission, Shell repeatedly kicked his father before striking him with several objects, including a pipe and speaker. Shell confessed he stabbed his father with one knife, then took the time to get another knife to stab him again. Finally, Shell tied his father's feet with wire and wrapped a clothes hanger around his neck. The physical evidence supports Shell's account of the killing. There was certainly time and opportunity for Shell to formulate the intent to kill his father. While the evidence indicates Shell may have been acting out of anger or rage, it does not negate the trial court's finding that Shell intended to kill his father and that the murder was premeditated.

For the foregoing reasons, the judgment appealed from is affirmed.

*Affirmed.*

Coleman, J., and Keenan, J., concurred.