COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Annunziata and Humphreys
Argued at Alexandria, Virginia


JASON A. MORANT

                                        MEMORANDUM OPINION[*] BY
v.    Record No. 2559-00-4            JUDGE ROSEMARIE ANNUNZIATA
                                            JANUARY 22, 2002
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                        F. Bruce Bach, Judge

          Daniel T. Lopez, Senior Assistant Public
          Defender, for appellant.

          John H. McLees, Jr., Senior Assistant
          Attorney General (Randolph A. Beales, Acting
          Attorney General, on brief), for appellee.


     Appellant, Jason Morant, was convicted of first degree

murder by a jury and sentenced to forty years imprisonment.  He

contends on appeal that the trial court erroneously refused to

grant his proffered instruction on voluntary manslaughter as a

lesser-included offense and that it improperly responded to

certain jury questions during its deliberations on guilt.  For

the reasons that follow, we affirm.

                            Background

     "Although the Commonwealth prevailed at trial, the

appropriate standard of review requires that we view the

_____

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

evidence with respect to the refused instruction in the light most favorable to the defendant."  Boone v. Commonwealth, 14 Va. App. 130, 131, 415 S.E.2d 250, 251 (1992).  The evidence proved that Robin Kehrer, the victim in this case, and Morant were engaged in an intense but unstable romantic relationship for approximately six and one-half years before the offense at issue.  Kehrer had two children, at least one of which was purportedly Morant's child.  They worked for the same company, Inacom, and lived together for various periods of time, up to the last several months before Kehrer was killed.

On October 6, 1999, the Wednesday evening before the killing, Morant and Kehrer had a dispute that resulted in each moving out of the townhouse in which they had been living with the two children.  Kehrer did not return to work until Monday, October 11, 1999.  She appeared to be upset and asked a co-worker to warn her if Morant appeared.  When she was advised he had arrived, Kehrer "snuck" into her cubicle.

Kehrer and Morant were later observed talking together in an alcove leading to an entrance to an interior stairwell.  A few minutes later, Inacom employees heard a scream, which one described as sounding like a call for help or an expression of surprise.

Morant told police detective Boyle in an interview that Kehrer "just went off, told him that she was going to ruin him, destroy him, kick him out of the house, [sic] he was going to

wish he had never been born."  He told Boyle that "he just snapped."  He said he felt dizzy, saw white flakes, and just lost it all in one day.  "'[Kehrer] was the mother of my children.  I can't believe what happened.  I wish I had hurt myself instead.'"  Morant measured more than six feet in height and weighed over 220 pounds.  Kehrer was five feet tall, and at autopsy, weighed 126 pounds.

Morant testified to his relationship with Kehrer, the difficulties he had with her family, the reasons for their separation, the Monday confrontation before her death, and threats Kehrer allegedly made to him.  According to Morant, Kehrer told him:

> You're crazy.  I'm going to tell everybody
> you're crazy.  You're never going to see the
> kids again.  I spoke with Wayna and she's
> not going to let you see Kyle either. . . .
> I'm going to get you fired from the job, you
> know, I'm going to tell everybody that you
> tried to commit suicide and, you know,
> they're not going to want you here.

Morant described his response as follows:

> And it hit me like a shock. . . . [M]y heart
> started beating really, really fast.  And at
> that point it just -- emotionally, I was
> surprised and hurt. And there was [sic] all
> the things that I had shared with her about
> how I felt, she just went right down the row
> and hit like each one of them.

Morant started down the stairway but Kehrer grabbed him about his waist to stop him.  When he turned around, he had "another flash and felt like the pain in my stomach again.  I

saw her standing like with her finger in my face.  And I didn't hear what she was saying . . . ."  The next thing he remembered was "kneeling down on the stairs with my hands around [Kehrer's] neck, choking her."

He sat Kehrer up but she was "totally flaccid."  He took off his belt and put it around her neck and tied it to the banister because he did not want to leave her on the ground and "it made sense at the time to hang her there."  He did not try to revive her or call for help.

Asked why he killed her, Morant testified that "when she confronted me with all the things she was going to do to me, something just snapped. . . . Anger was the least of what I felt."  Morant gave varying explanations about his motivation, stating and then retracting that the things that Kehrer said to him that morning triggered the killing.

Kehrer's body was found at the bottom of the stairwell, hanging by a belt wrapped around her throat and tied to the handrail.  She had socks on but no shoes.  Police investigating the crime scene found Kehrer hanging 50 steps below the fourth floor.  There was an earring loose in her hair.  The medical examiner testified that she had suffered bruises to the inside of her lower lip, the front of her tongue, and the insides of both sides of the front of her scalp.  The latter bruises were consistent with having been punched or having banged her head against hard surfaces.  She had two abrasions on the outside of

her left foot consistent with having been dragged and abrasions on her left knee and lower leg and back of her left shoulder.  A pierced earring hole in her left ear was bruised and bloodied.

The cause of death was strangulation; signs of both strangulation by hand and by the belt were manifest.  The medical examiner was of the opinion that Kehrer could have been revived if she had been given CPR within minutes of asphyxiation.

The trial court gave a finding instruction allowing possible verdicts of first or second-degree murder or not guilty.  It refused to give Morant's proffered finding instruction and related instruction on voluntary manslaughter and heat of passion.  The jury was given Instruction H, which reads:

> Willful, deliberate, and premeditated means a specific intent to kill adopted at some time before the killing, but which need not exist for any particular length of time.

During deliberations, the jury sent out two written questions:  "Can 'premeditation' occur during the act of 'killing?'" and "Does 'killing' mean the act, i.e., strangulation, or the moment of death?"  In response, the trial court first re-read to the jury Instruction "H" defining "willful, deliberate and premeditated."  It then said,

> Is that the killing you're talking about, in that context?  And in the context of this case, and in the context of this

> instruction, that means the time of death, adopted before the time of death, but need not exist for any particular length of time,
>
> "Can premeditation occur during the act of killing?" If what you mean by that is during the act of the strangulation, yes, as long as it's before it's completed.

## Analysis

### A. Refusal to Grant Voluntary Manslaughter Instruction

Assuming without deciding that the trial court erred by refusing to instruct the jury on voluntary manslaughter, any such error was harmless beyond a reasonable doubt. See Turner v. Commonwealth, 23 Va. App. 270, 275-78, 476 S.E.2d 504, 507-08 (1996) (holding that failure to instruct jury on voluntary manslaughter was harmless because jury had rejected second degree murder conviction), aff'd, 255 Va. 1, 492 S.E.2d 447 (1997). In Turner, we reasoned that by rejecting the lesser-included offense of second degree murder, "the jury found beyond a reasonable doubt that appellant acted not only maliciously, but also willfully, deliberately, and premeditatedly." Id. at 277, 476 S.E.2d at 508. Because "premeditation and reasonable provocation can not co-exist," id., "[the jury] necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included offense of voluntary manslaughter." Id. at 278, 476 S.E.2d at 508. Bound by our decision in Turner, we affirm the trial court's refusal to instruct the jury on voluntary manslaughter.

## B.  Response to Jury Question

Morant contends that the court's response to the jury's questions misrepresented the law, improperly usurped the fact finding task of the jury, and effectively instructed the jury that all strangulations are first degree murder.  We disagree.

It is elemental that the trial court must "give a direct and correct repose to an inquiry by the jury and its failure to do so is ground for reversal."  Shepperson v. Commonwealth, 19 Va. App. 586, 591, 454 S.E.2d 5, 8 (1995); accord Jimenez v. Commonwealth, 241 Va. 244, 250, 402 S.E.2d 678, 681 (1991).  In this case, the jury inquired "Can 'premeditation' occur during the act of 'killing?'" and "Does 'killing' mean the act, i.e., strangulation, or the moment of death?"  The trial court responded that "[I]f what you mean by that is during the act of the strangulation, yes, as long as it's before it's completed."

In effect, the trial court told the jury that premeditation may occur during the act that causes death, but before the victim actually died.  This instruction is consistent with Virginia case law.  It is well settled that premeditation may arise "at the time of the murder."  Beck v. Commonwealth, 2 Va. App. 170, 176, 342 S.E.2d 642, 646 (1986); accord Clozza v. Commonwealth, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984) (holding that the intention to kill need not exist for any specified length of time prior to the actual killing but may be formed "only a moment before the fatal act is committed provided

that the accused had time to think and did intend to kill" (emphasis added)); Akers v. Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975) ("The intent to kill may spring into existence for the first time at the time of the killing . . . ."); Bradshaw v. Commonwealth, 174 Va. 391, 398-99, 4 S.E.2d 752, 755 (1939) (holding that premeditation may "come into existence for the first time at the time of [the] killing . . ." (citation omitted)).

Consistent with this rule, it is settled that a defendant's prolonged physical effort to cause death is relevant to determine the existence of premeditation. Lenz v. Commonwealth, 261 Va. 451, 469, 544 S.E.2d 299, 309 (2001) (holding that defendant's act of repeatedly stabbing the victim in the chest entitled jury to find he acted with premeditation); Whitley v. Commonwealth, 223 Va. 66, 72, 286 S.E.2d 162, 165 (1982) (holding that defendant had ample time to meditate because the evidence proved that he choked his victim with his hands, strangled her with a rope and cut her throat with a knife); Shell v. Commonwealth, 11 Va. App. 247, 257, 397 S.E.2d 673, 679 (1990) (finding that evidence that defendant killed victim by kicking, striking, stabbing, and tying him with wire and electric cord sufficiently demonstrated time and opportunity for premeditation); Beck, 2 Va. App. at 176, 342 S.E.2d at 646 (holding that defendant's prolonged effort to strangle and suffocate victim was properly considered as evidence of

premeditation).  Therefore, it is implicit that premeditation can occur <u>during</u> the act that causes death, as the trial court properly instructed the jury.

Morant also contends that the trial court's reference to "strangulation" rather than to "the act of killing" usurped the jury's role as fact finder such that the court, and not the jury, determined the cause and manner of death.  See <u>Clozza</u>, 228 Va. at 134, 321 S.E.2d at 279 (holding that premeditation is a jury question).  We find no merit in this contention.  In its inquiry, the jury referred to the act of killing as "strangulation."  Furthermore, the only evidence of the act resulting in the victim's death in this case was that of strangulation, and defendant never contended otherwise.  We conclude, therefore, that the trial court did not err in its response to the jury's question and did not improperly provide "any suggestion in the jury instructions as to the conclusion [to be drawn]."  <u>Terry v. Commonwealth</u>, 5 Va. App. 167, 171, 360 S.E.2d 880, 882 (1987).

For the foregoing reasons, we affirm the conviction.

<u>Affirmed.</u>