COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, AtLee and Senior Judge Clements
Argued at Lexington, Virginia


JACK EUGENE TURNER

v.      Record No. 2039-15-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
NOVEMBER 22, 2016


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
A. Joseph Canada, Jr., Judge Designate

C. Holland Perdue III (Raine & Perdue, PLC, on briefs), for
appellant.

Christopher P. Schandevel, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Jack Eugene Turner ("Turner") appeals the December 8, 2015 decision of the Circuit

Court for the County of Franklin (the "circuit court") convicting Turner of one count of

displaying a noose with the intent to intimidate, in violation of Code § 18.2-423.2.  Turner's

three assignments of error are that the circuit court erred in (1) denying Turner's motion to

dismiss because the circuit court failed to find that the displaying of a noose on private property

was protected free speech under the Constitution of the United States; (2) denying that Turner

lacked a constitutional right to express his freedom of speech by displaying a noose on his own

property; and (3) finding Turner guilty of displaying a noose with the intent to intimidate, in

violation of Code § 18.2-423.2.

I.  Background

On Wednesday, June 17, 2015, around 5:00 p.m., Traze Witcher ("Witcher") was returning home from her job as a nurse at Trinity Mission of Rocky Mount.  Shortly after she turned on to her street, Lindsey Lane in Rocky Mount, Franklin County, Virginia, she spotted an all-black, life-size dummy hanging by a noose from a tree in the yard ("the noose display") of the second house, 108 Lindsey Lane.[1]  Witcher testified that, to her, it appeared as if a black man was being hanged "from a rope from a tree in [Turner's] yard."  Only hanging fifteen to thirty feet from the side of the road, the noose display was visible to anyone traveling on Lindsey Lane.

Turner resides and owns the property at 108 Lindsey Lane.  He resides next door to John and Keena Mitchell ("John" or "Keena" or collectively "the Mitchells").[2]  Keena is Witcher's sister; John is Witcher's brother-in-law.  The Witchers and the Mitchells are the only African-American families residing on Lindsey Lane.  The Mitchells live with their two male children in the first house on Lindsey Lane.  The Mitchells' home sits approximately thirty to forty feet from Turner's home, and a fence does not separate the properties.

Immediately after seeing the noose display, Witcher turned around and drove directly to the Mitchells' house.  Witcher testified that she was so fearful upon seeing the black dummy hanging from the noose in Turner's yard that all she could do after arriving at the Mitchells' home was blow the car horn until Keena and John came outside.  Witcher drove Keena and John to see the noose and black dummy display.  Upon seeing the display, John went to the Franklin County Sheriff's Department (the "Sheriff's Department") and reported the sight.

---

[1] Lindsey Lane is a long gravel road with approximately a dozen homes located along it. The only option for residents to access their property is by traveling this road past Turner's property.

[2] At the time Turner presented the noose display, Witcher had lived on Lindsey Lane for over ten years.  The Mitchells had lived on Lindsey Lane for two years.

The following day, Captain Paul Caldwell ("Captain Caldwell") of the Sheriff's Department began investigating John's report. Captain Caldwell arrived at Turner's residence around noon on Thursday, June 18, 2015. Captain Caldwell asked Turner about the object hanging from the tree in Turner's yard. Turner stated that it was a "scarecrow." When Captain Caldwell commented that there was no reason for a scarecrow without a garden, Turner implied it was to scare away people. Turner explained that he was a "raciest" and that he "did like blacks but not niggers."[3] At this point, Captain Caldwell told Turner that the noose display was a "violation" and would be seized after Captain Caldwell spoke with the Commonwealth's Attorney. Then, Captain Caldwell and another officer photographed the dummy as it hanged in the noose.[4] After taking photographs, the noose display was removed and taken to the Sheriff's Department.

Prior to this incident, little contact occurred between Turner and the Witchers and the Mitchells. On one occasion, in December 2013, the Mitchells received a letter from Turner apologizing for the type of person he was and for not giving them a chance to let him find out what kind of neighbors they were. On a separate occasion, Turner called the police on the Mitchells to report them for a "humming noise" that he often complained emitted from the Mitchells' property. Yet, prior to June 17, 2015, neither John nor Keena Mitchell feared Turner. As for Witcher, in April 2015 she borrowed Keena's van only to have Turner flip his middle finger at her as she passed his property. Then, Turner said "[you] people are nothing but ignorant" and called Witcher a "stupid B."

_____

[3] Turner pronounced the word "raciest" as the spelling reflects in this opinion and noted in the record. It is understood that he meant racist.

[4] The dummy's neck was wrapped in duct tape and the rope had been tied around the neck and one of the dummy's arms. The dummy's feet were hanging several feet off the ground.

At trial, John testified that after seeing the noose display he was especially upset because nine African-Americans had been killed in South Carolina earlier the same day at the "Charleston Church Shooting."[5] He specified that the noose display caused him to fear for his family's safety. John's wife, Keena, testified that upon seeing the noose display she feared for herself and her children. In the days after seeing the noose display, John stated that before he would leave for work in the morning he would check to make sure no one was standing in his yard. Also, each day he questioned whether he was going to return home from work with something thrown at his house or a message spray painted on his home. John attributed his feelings to seeing the noose display on Turner's property.

After the incident, the Mitchells no longer allow their sons to walk past Turner's house because the Mitchells are uncertain of what Turner is capable of doing. John explained that "if [Turner] can hang a noose I don't know what he is going to do." Although the Mitchells did not directly interact with Turner again after the noose display, Turner continuously hung a confederate flag in a window of his home facing the Mitchells' house.[6]

On August 3, 2015, a Franklin County grand jury issued an indictment against Turner that on or about June 17, 2015, Turner "unlawfully and feloniously did display a noose on a public place in a manner having a direct tendency to place another person in reasonable fear or apprehension of death of [sic] bodily injury and with the intent of intimidating a person or group of persons." Turner was arrested for violating Code § 18.2-423.2.

---

[5] The "Charleston Church Shooting" is a reference coined by the media and is commonly used to refer to a mass shooting resulting in nine deaths that took place at the Emanuel African Methodist Episcopal Church in downtown Charleston, South Carolina, on June 17, 2015.

[6] Although not part of our analysis, the record reflects that while Turner was out on bond awaiting his sentencing hearing, he placed a handmade cardboard sign against his house that read, "Black nigger lives don't matter, got rope."

Prior to trial, Turner filed a motion to dismiss arguing that the conduct for which he was charged was protected free speech granted by the First Amendment of the Constitution and that he did not violate Code § 18.2-423.2 because the noose display was exhibited on private property, which is not property of another, a highway, or public place. On August 20, 2015, the circuit court took Turner's motion to dismiss under advisement and continued the case for a bench trial on September 22, 2015.[7]

At trial, Turner pleaded not guilty to the charge against him. The circuit court overruled Turner's motion to dismiss and found that he hanged the noose in a public place because it was up in a tree where it was visible from the road. The circuit court further found the noose display was hanged to specifically intimidate others. Thus, the circuit court found Turner guilty of violating Code § 18.2-423.2. On December 8, 2015, Turner appeared in the trial court for sentencing. Prior to the sentencing hearing, the circuit court heard argument on Turner's motion to reconsider the finding of guilt. This motion was denied. Afterward, the circuit court sentenced Turner to five years' incarceration with four years and six months suspended.

## II. Analysis

### A. Standard of Review

"Under well-settled principles of appellate review, [this Court] consider[s] the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." Smallwood v. Commonwealth, 278 Va. 625, 629, 688 S.E.2d 154, 156 (2009) (quoting Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008)). "This principle requires this Court to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to

---

[7] At the hearing regarding Turner's motion to dismiss, Turner announced that he was not arguing the constitutionality of the statute; rather, his argument is that he was unconstitutionally seized.

- 5 -

be drawn therefrom.'" Beck v. Commonwealth, 66 Va. App. 259, 262, 784 S.E.2d 310, 311 (2016) (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980)). "It is the prerogative of the trier of fact to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Sierra v. Commonwealth, 59 Va. App. 770, 776, 722 S.E.2d 656, 658 (2012) (quoting Brown v. Commonwealth, 56 Va. App. 178, 185, 692 S.E.2d 271, 274 (2010)).

"A factfinder's resolution of conflicting facts, as well as competing inferences, receives 'the highest degree of appellate deference.'" Coleman v. Commonwealth, 52 Va. App. 19, 23 n.2, 660 S.E.2d 687, 689 n.2 (2008) (quoting Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006)). This Court does "not ask whether we, as appellate judges, believe 'the evidence at the trial established guilt beyond a reasonable doubt.'" Thomas, 48 Va. App. at 608, 633 S.E.2d at 231 (quoting Stevens v. Commonwealth, 46 Va. App. 234, 249, 616 S.E.2d 754, 761 (2005) (*en banc*)). Rather, we ask only whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Stevens, 46 Va. App. at 249, 616 S.E.2d at 761. Furthermore, "[t]he judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict, and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Crislip v. Commonwealth, 37 Va. App. 66, 69, 554 S.E.2d 96, 97 (2001) (quoting Beck v. Commonwealth, 2 Va. App. 170, 172, 342 S.E.2d 642, 643 (1986)). Finally, questions of both constitutional interpretation and statutory construction are reviewed *de novo*. Lawlor v. Commonwealth, 285 Va. 187, 240, 738 S.E.2d 847, 877 (2013).

B.  Whether Turner's actions constitute "True Threats" which are not protected by the First Amendment

> "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting."

> —Justice Sandra Day O'Connor, Virginia v. Black, 538 U.S. 343, 358 (2003).

In 2009, the General Assembly enacted Code § 18.2-423.2, which provides as follows:

> A. Any person who, with the intent of intimidating any person or group of persons, displays a noose on the private property of another without permission is guilty of a Class 6 felony.

> B. Any person who, with the intent of intimidating any person or group of persons, *displays a noose* on a highway or other *public place in a manner having a direct tendency to place another person in reasonable fear or apprehension of death or bodily injury is guilty of a Class 6 felony.*

(Emphasis added).  In his first two assignments of error, Turner argues that his conviction under Code § 18.2-423.2(B) should be reversed because, notwithstanding the provisions of that statute, he had "an absolute right under the First Amendment of the United States Constitution, however reprehensible or offensive, to burn a cross, fly any flag or to hang a noose in/on [his] own private property."

It is a foundational right that "[t]he First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'"  Black, 538 U.S. at 358 (quoting U.S. Const. amend. I).  "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  Texas v. Johnson, 491 U.S. 397, 414 (1989).  "The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."  Black, 538 U.S. at 358.  However, protections afforded by the First Amendment are not absolute.

The Supreme Court of the United States has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." Id. True threats are among the certain categories of speech that a state may prohibit without violating the First Amendment. Id. at 359. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. Even where the speaker does not "actually intend to carry out the threat," a "prohibition on true threats protects individuals from fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Id. at 360. Intimidation in the "constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id.

Code § 18.2-423.2, Virginia's noose statute, is substantially similar to Virginia's cross-burning statute, Code § 18.2-423, that was upheld by the Supreme Court of the United States in Virginia v. Black. 538 U.S. at 347-48. Pursuant to Virginia's cross-burning statute, it is a felony "for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place." Id. at 348; Code § 18.2-423. The statute further provides that "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons," a provision that has no equivalent in Virginia's noose statute. Black, 538 U.S. at 348; Code §§ 18.2-423, 18.2-423.2.

Black consolidated three cases involving convictions based on Code § 18.2-423. Appellant Black burnt a cross on the private property of another with permission during a Ku Klux Klan (the "Klan") rally in Carroll County, Virginia. Black, 538 U.S. at 348, 350. The

- 8 -

other two appellants, Richard Elliott and Jonathan O'Mara, were not affiliated with the Klan and had burnt a cross on the private property of an African-American man in the City of Virginia Beach, Virginia. Id. at 350. The Supreme Court of Virginia held Code § 18.2-423 unconstitutional on its face. Black v. Commonwealth, 262 Va. 764, 779, 553 S.E.2d 738, 746 (2001). However, the Supreme Court of the United States considered and rejected the Supreme Court of Virginia's judgment that Virginia's "cross-burning statute is unconstitutional because it discriminates on the basis of content and viewpoint." Black, 538 U.S. at 360. Disagreeing, the Supreme Court of the United States held that the First Amendment permits a state to "choose to prohibit only those forms of intimidation that are most likely to inspire fear of bodily harm." Id. at 363. Thus, Virginia can "outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." Id. "Instead of prohibiting all intimidating messages, Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence." Id. Ultimately, the Supreme Court concluded that a state may "choose to prohibit only those forms of intimidation that are most likely to inspire *fear of bodily harm*." Id. at 363 (emphasis added).

Turner quotes Black v. Commonwealth—which the Supreme Court of the United States reversed in Virginia v. Black—for the general proposition that people have the right to "use symbols to communicate," and thus they may "reverently worship the cross or burn it as an expression of bigotry." 262 Va. at 778-79, 553 S.E.2d at 746. However, in Virginia v. Black, the Supreme Court held that the "fact that cross burning is symbolic expression . . . does not resolve the constitutional question." 538 U.S. at 361. Here, the fact Turner hanged a dummy in a noose in his front yard as a form of "symbolic expression . . . does not resolve the constitutional question" either. Id. Rather, we look to whether the public display of a noose evokes a "long and pernicious history as a signal of impending violence." Id. at 363.

- 9 -

"During this country's 'lynching era'—the five decades between the end of Reconstruction and the beginning of the Great Depression, between 1880 and 1930—at least 2,462 African American men, women, and children died at the hands of southern mobs." Lu-in Wang, The Complexities of "Hate", 60 Ohio St. L.J. 799, 833 (1999). "The mob inflicted death, death that was the result of extraordinary, sadistic cruelty." Id. at 834. "Almost all of their killers were white." Id. at 833. We know from historical accounts that victims were often tortured before being executed, sometimes "by being slowly roasted over a fire," other times "by having limbs or sexual organs amputated." Id. at 834. After an execution, members of the mob might distribute "pieces of the charred remains . . . as souvenirs to the mob whose members desired a keepsake as a remembrance of the notable happening." Id. "In short, the phenomenon of lynching exhibited American society in its most ferocious and inhuman manifestation." Id.

"[L]ynching had a powerful terroristic effect on the target population." Id. at 835. "The use of violence was aimed not just at the individual victim but at the black community generally, and the gruesome details of each event were publicized widely through the press and word of mouth." Id. at 835-36. "As a result, southern blacks lived with the knowledge that any one of them could be a victim at any time." Id. at 836. Therefore, we conclude that the public display of a noose evokes a "long and pernicious history as a signal of impending violence." Black, 538 U.S. at 363. As a result of lynching's history as a clear signal of impending violence, we hold that the Commonwealth may choose to regulate this subset of intimidating messages through the display of a noose in the same manner and for the same reason it may regulate the message conveyed by the burning of a cross. Id. at 360.

Virginia's statute prohibiting the display of a noose, Code § 18.2-423.2, contains the same "intent of intimidating any person or group of persons" element contained in the cross-burning statute, Code § 18.2-423. Moreover, Virginia's noose statute does not contain the

- 10 -

prima facie evidence provision contained in the cross-burning statute that the plurality in <u>Black</u> found to be unconstitutional.  538 U.S. at 347-48, 367.  Furthermore, the General Assembly inserted an additional element in the noose statute not found in the cross-burning statute—in order to convict a defendant for hanging a noose under Code § 18.2-423.2(B), the Commonwealth is required to prove that the noose was displayed "in a manner having a direct tendency to place another person in reasonable fear or apprehension of death or bodily injury." Because of this added element, we hold that the scope of Code § 18.2-423.2 only encompasses the exhibition of a noose that represents a "true threat."  <u>See</u> <u>Black</u>, 538 U.S. at 360.

"Intimidation" rises to the level of a "true threat" in cases where, as here, the person communicating the threat "directs [the] threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."  <u>Id.</u>  Thus, pursuant to <u>Black</u>, we hold that displaying a noose in the manner Code § 18.2-423.2 proscribes constitutes a "true threat," and, like cross burning, it is undeserving of First Amendment protection.  Considering the evidence presented at trial in the light most favorable to the Commonwealth, Turner intended to intimidate others via his noose display.  In short, while the First Amendment protects Turner's right to be a racist and even to convey his racist beliefs to others, the protections of our Constitution do not permit him to threaten or intimidate others who do not share his views.  Therefore, when his "speech" took the form of actions intended to threaten, intimidate or place others in reasonable fear of bodily harm, his symbolic "speech" was not entitled to constitutional protection.

With regard to Turner's second assignment of error in which he argues that he had an absolute right under the First Amendment to use symbolic or offensive conduct however reprehensible or offensive and with the intent to intimidate if he did so upon his own property, we conclude that he has procedurally defaulted that issue.  Pursuant to Rule 5A:20(e), an appellant's opening brief must contain "[t]he principles of law, the argument, and the authorities

- 11 -

relating to each question presented." "Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration. We will not . . . correct deficiencies in a brief." Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992). Turner failed to cite any authority whatsoever in support of his argument that the First Amendment offers blanket protection for threats made on his private property, thus he failed to comply with the provisions of Rule 5A:20(e), and we will not consider his arguments on appeal. Moreover, in concluding that the First Amendment does not offer the sort of blanket protection that Turner seeks, Justice Holmes famously observed in Schenk v. United States, 249 U.S. 47 (1919), that falsely shouting "fire" in a crowded theater is not protected speech under the First Amendment and we can think of no principled constitutional reason why that should change if you happen to own the theater and Turner has offered none.

### C. Public Place: Code § 18.2-423.2

The meaning of the words "public place," in the context of Code § 18.2-423.2, is a question of first impression in the Commonwealth.[8] Code § 18.2-423.2(B) prohibits displaying a noose "on a highway or other *public place*." (Emphasis added). Turner alternatively argues that his conviction should be overturned because Code § 18.2-423.2 "does not ban the conduct complained of . . . as it occurred solely on Turner's property" and therefore not in a "public place." Further, Turner argues that the circuit court's "finding that [his] property was a public place is erroneous and not supported by even the most expansive definition of public property."

---

[8] Code § 4.1-100 defines "public place," as "any place, building, or conveyance to which the public has, or is permitted to have, access, including restaurants, soda fountains, hotel dining areas, lobbies, and corridors of hotels, and any highway, street, lane, park, or place of public resort or amusement." However, "Code § 4.1-100 limits its definitions of terms, including 'public place,' to Title 4.1, applying the provisions of the Alcoholic Beverage Control Act. There is no nexus in statute or case law between the provisions of Titles 4.1 and 18.2 to substantiate the argument to transmorph the definition of non-identical terms in one to the other." Crislip, 37 Va. App. at 70, 554 S.E.2d at 98.

When interpreting and applying a statute, this Court assumes "that the General Assembly chose, with care, the words it used in enacting the statute, and we are bound by those words." PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth., 286 Va. 174, 183, 747 S.E.2d 826, 831 (2013). "Moreover, when the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code," a reviewing court "must presume that the difference in the choice of language was intentional." Zinone v. Lee's Crossing Homeowners Ass'n, 282 Va. 330, 337, 714 S.E.2d 922, 925 (2011). Here, the General Assembly used the word "property" in subsection (A), and "place" in subsection (B). Code § 18.2-423.2. Accordingly, we "must presume" that the General Assembly meant something other than public *property* when it proscribed the displaying of a noose in a "public *place*" in subsection (B). Zinone, 282 Va. at 337, 714 S.E.2d at 925; Code § 18.2-423.2(B) (emphasis added).

"The primary objective of statutory construction is to ascertain and give effect to legislative intent. The plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction." Commonwealth v. Zamani, 256 Va. 391, 395, 507 S.E.2d 608, 609 (1998). A common dictionary definition of the word "public" is "a place accessible or *visible* to all members of the community." Webster's Third New International Dictionary 1836 (3d ed. 1993) (emphasis added). The same dictionary defines the word "place" as "physical environment" or "physical surroundings." Id. at 1727. Black's Law Dictionary defines "public place" as "[a]ny location that the local, state, or national government maintains for the use of the public, such as a highway, park, or public building." Public Place, Black's Law Dictionary (10th ed. 2014). These definitions alone do not provide much guidance.

Yet, while the definition of "public place" may be a case of first impression under the current Code, the Supreme Court of Virginia previously defined the term in Hackney v.

- 13 -

Commonwealth, 186 Va. 888, 45 S.E.2d 241 (1947), in the context of the Code of Virginia then in effect.  In Hackney, the Supreme Court decided "whether loud, boisterous, vile and abusive language uttered by a man standing on his porch to a person passing along the highway within thirty feet of the speaker constitutes disorderly conduct within the meaning of chapter 296 of the Acts of 1946."  Id. at 889-90, 45 S.E.2d at 241-42.  The Court held that it did.  In doing so, the Supreme Court provided us a framework of how to define "on a highway or other *public place*" because it had to determine the meaning of the phrase within the Code section at the time, "[i]f any person behaves in a riotous or disorderly manner in any street, highway, public building, or any *other public place* . . . , he shall be guilty of a misdemeanor."  Id. at 890, 45 S.E.2d at 242 (emphasis added).

As we have done here, the Hackney Court began its analysis with the commonly understood definition:

> Webster's International Dictionary, 2d Ed., defines "place" as "a portion of space occupied by a body;" "any particular spot or locality."  The same authority defines "public" as "open to the knowledge or view of all; generally seen, known, or heard; without privacy, concealment, etc."  "A place so near and so open that persons traveling the highway can see card or dice playing thereat is abstractly and per se a public place."  6 Words and Phrases, p. 5807.  Bouvier's Law Dictionary defines "public place" as "Any place so situated that what passes there can be seen by any considerable number of persons, if they happen to look."

Id. at 891-92, 45 S.E.2d at 242-43.  Then, the Court reasoned that

> [t]he use of offensive language on one's own premises does not constitute a violation of . . . Penal Law *unless* that person communicates it to the public; for example, shouts offensive language from a window on a public street and thus annoys and disturbs some person or persons who are within hearing of the voice.

Id. at 893, 45 S.E.2d at 243 (emphasis added).  Extrapolating from the language in Hackney, we hold that the use of offensive language by use of a symbol on one's own premises constitutes a

- 14 -

violation of the law when that symbol is used as a means to communicate it to the public, and thus disturbs persons who are within the viewpoint of the communication, display, or message.

In the case at bar, we conclude that the General Assembly's purpose in enacting the noose statute is to prohibit people from displaying nooses to communicate "true threats" as defined in Black. A "prohibition on true threats protects individuals from fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Black, 538 U.S. at 360. We conclude that using the definition for "public place" endorsed in Hackney to define the phrase in Virginia's noose statute furthers the General Assembly's purpose in prohibiting the display of nooses where such display is accompanied by the intent to intimidate and conducted in a manner having a direct tendency to place people in reasonable fear of death or bodily injury. Thus, we adopt the definition for the term "public place" that gives effect to this legislative intent as announced in Hackney.

It is without doubt that the location of the noose and dummy in Turner's front yard— where it was "clearly visible" from the street—qualifies as a "public place" under the definition in Hackney. The facts, taken in the light most favorable to the Commonwealth, demonstrate that Turner admitted to Captain Caldwell that the noose and dummy were utilized as a "scarecrow" meant to "scare people away." Witcher and the Mitchells testified that the noose and dummy were "very visible" and "clearly visible" to them from the street, and were hanging in "plain sight" where you "couldn't miss it if you tried." Moreover, when Witcher and the Mitchells saw the noose display, they feared for their safety and for the safety of their families.

### III. Conclusion

As Justice Robert Jackson reminded us, "the very essence of constitutional freedom of press and of speech is to allow more liberty than the good citizen will take. The test of its vitality is whether we will suffer and protect much that we think false, mischievous and bad, both

in taste and intent." <u>Williamson v. United States</u>, 184 F.2d 280, 283 (2d Cir. 1950).  A constitutional limit to that allowance has been reached when an idea becomes a threat that causes reasonable people to fear leaving their homes.

For all of these reasons, we conclude that Code §18.2-423.2 is constitutional as applied in this case and further that the evidence was sufficient to support the circuit court's conclusion that the offense occurred in a public place.  Under circumstances in this case the use of an intimidating and threatening display on one's own premises constituted a violation of the law because Turner displayed a noose and dummy in a place and manner to communicate threats to others with the intent to place members of the public in fear of violence and bodily harm.  We therefore affirm the judgment of the circuit court convicting Turner of displaying a noose with the intent to intimidate, in violation of Code § 18.2-423.2.

<u>Affirmed.</u>