## Richmond

ALBERT J. CLOZZA

V.

COMMONWEALTH OF VIRGINIA

Record No. 832053.

September 7, 1984.

Present: All the Justices.

*Peter T. Legler* for appellant.

*Robert Q. Harris, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is the automatic review of a sentence to death. The trial errors enumerated by the defendant involve the qualifications of jurors, sufficiency of the evidence to prove rape and premeditation, admissibility of certain photographic exhibits, and propriety of the prosecutor's closing argument. In addition to reviewing the foregoing alleged errors, we shall also determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Code § 17-110.1(C).

On January 13, 1983, 13-year-old Patricia Beth Bolton was brutally murdered in the City of Virginia Beach. On the next day, defendant, Albert J. Clozza, age 22, was arrested. He subsequently was indicted for the following crimes involving the child: abduction, Code § 18.2-48; two offenses of forcible sodomy, Code § 18.2-67.1; sexual penetration with an inanimate object, Code § 18.2-67.2; aggravated sexual battery, Code § 18.2-67.3; and capital murder, that is, the wilful, deliberate, and premeditated killing of the victim during the commission of, or subsequent to, rape. Code § 18.2-31(e).

Following a jury trial that lasted for portions of nine days, the defendant was found guilty of all charges on November 3, 1983. The jury fixed punishment at separate terms of life imprisonment for each of the noncapital crimes except aggravated sexual battery, for which the jury assessed 20 years. These sentences were confirmed by the trial court and we do not have these convictions before us for review.

During the second phase of the bifurcated capital proceeding held on November 4, 1983, the jury fixed defendant's punishment at death for the capital murder. Subsequently, the trial court considered a probation officer's report and additional evidence relevant to punishment. After a hearing on November 22, 1983, the court sentenced defendant to death for the capital murder. The sentence of death is before us for review under Code § 17-110.1(A), *see* Rule 5:20, and we have consolidated this review

with defendant's appeal of the capital murder conviction. Code § 17-110.1(F).

First, defendant argues that the trial court erred in refusing his motion to strike for cause jurors Peggy Anderson and Margaret Walton. He contends the voir-dire questioning showed they were predisposed in favor of the death penalty, and thus did not "stand indifferent in the cause," as required by Code § 8.01-358. *See* Rule 3A:14. The defendant bases this claim upon the jurors' affirmative responses when asked whether they believed the only "appropriate" punishment was death rather than life imprisonment, in the event the accused was found guilty of capital murder. We reject this contention.

The defendant dwells on isolated portions of the lengthy and thorough individual interrogation of these jurors. However, we do not confine our review of the correctness of the trial court's action on voir dire only to portions of the questioning. *Fitzgerald* v. *Commonwealth,* 223 Va. 615, 628, 292 S.E.2d 798, 805 (1982), *cert. denied,* 459 U.S. 1228 (1983). In this case, the relevant portions of Anderson's voir dire cover 14 pages of printed record while the pertinent parts of Walton's questioning cover 19 pages of transcript. Our examination of the entire voir dire of these jurors reveals that both demonstrated complete objectivity about the death penalty. Neither demonstrated an unalterable bias in favor of or against imposition of the extreme penalty. *See Patterson* v. *Commonwealth,* 222 Va. 653, 659, 283 S.E.2d 212, 216 (1981). Both indicated repeatedly that they would consider the evidence objectively and follow the instructions of the court in fixing punishment. Except when confused by some of the long questions propounded by counsel and the court dealing with "appropriate" punishment, both stated that they would enter the jury box with an open mind and wait until the entire case was presented before coming to a fixed conclusion as to guilt and punishment. In sum, the record demonstrates that the views of Anderson and Walton on capital punishment would not prevent or substantially impair the performance of their duties as jurors in accordance with the instructions of the court and their oath. *LeVasseur* v. *Commonwealth,* 225 Va. 564, 584, 304 S.E.2d 644, 655 (1983), *cert. denied,* 464 U.S. 1063 (1984) (quoting *Adams* v. *Texas,* 448 U.S. 38, 45 (1980)).

■ Additionally, the defendant contends that Walton should have been stricken for cause because she worked as a volunteer for the Virginia Beach Police Department. We do not agree.

Walton, the wife of a retired serviceman, stated that she responded to a public request for citizen volunteers to do non-police work for the Department. She worked six hours a day, one day a week, driving police vehicles from the City Garage to repair shops. She said that she came into direct contact with only one police officer and that she had no involvement with the activity of the Police Department in the apprehension of criminals. She indicated that she would be objective and judge with "an open mind" citizen testimony that was contrary to police testimony.

A prospective juror is not subject to automatic exclusion because of an association with law enforcement personnel, provided the juror has no knowledge of the facts of the case and demonstrates impartiality toward the parties. *State* v. *Ballard*, 337 So.2d 481, 483 (La. 1976); *see State* v. *Hunt*, 37 N.C. App. 315, 319-20, 246 S.E.2d 159, 162 (1978); *Eubanks* v. *State*, 635 S.W.2d 568, 572 (Tex. Civ. App. 1982). Here, Walton's voir dire shows that she was impartial and fails to show a bias against the defendant or in favor of the prosecution as a result of her volunteer police work.

Second, the defendant contends the evidence was insufficient to establish the charge of capital murder. Specifically, he argues that there was inadequate proof of rape and that the evidence failed to show premeditation. Consideration of the sufficiency question requires us to summarize the evidence. In accord with established appellate procedure, we will view the evidence, most of which was undisputed, in the light most favorable to the Commonwealth.

On Thursday, January 13, 1983, about 6:30 p.m. the victim left her family's residence in the Derby Run Trailer Park to walk alone to a bookmobile that routinely stopped near the Park on Thursday evenings. She had not returned home by about 8:00 p.m. and her father began searching the neighborhood without success. The police were called about 9:00 p.m., and the father continued searching until later in the evening.

The next morning, the father found a French book on the lawn of his home. He resumed his search and discovered his daughter's T-shirt and a blue notebook, with defendant's name in it, behind a residence near the Bolton home.

On that day, January 14, a search of the Derby Run area for the missing child was supervised by a Virginia Beach detective. Approximately 150 persons, mostly military personnel, participated in the search. Eventually, the search was concentrated in a large field adjacent to the trailer park that separated the park from higher, brush-covered, wooded ground.

About 3:00 p.m., five stacked books were found in the field with one of the child's tennis shoes. Stains from two "puddles" of blood were discovered near the books. Next, the victim's bra and her other shoe were found farther into the field from the residential area. Then, the child's blue jacket, corduroy trousers, underwear, and sock were discovered still farther into the field.

At 4:30 p.m., the child's body, unclothed except for one sock, was found by a member of the search party. The body was lying face down at the bottom of an embankment in the wooded area and was barely visible due to the surrounding brush and undergrowth. The body was encrusted with blood, vegetation-type debris, and mud.

Testimony from the medical examiner described the condition of the body. Externally, the entire front of the face was swollen and bruised. The lips were bruised, torn and crushed. The upper lip had been "stripped off the bone." The lower jaw was dislocated. The fat of the cheek was crushed and bruised from the inside.

There were scrapes on the knuckles of the hands and numerous scratch marks on the forearms, buttocks, backs of the thighs, legs, and front of the trunk. These marks apparently were made by bristles and thorns. There was bruising on the front of the knees and dirt driven into the skin. The area around the genitals was bruised. An elongated abrasion was found on the front, inside portion of the left thigh.

Internally, there was bleeding on the surface of the brain and hemorrhage of the scalp. The outer and inner lips of the vagina were bruised. There was a laceration near an area of attachment at the lower end of the inner lips of the vagina. There was tearing and bruising of the lining of the vagina. A piece of twig, three and three-quarters inches in length, had penetrated the vagina, perforated the vaginal wall, and protruded into the abdominal cavity.

Internally in the head and neck region, there was bleeding in the floor of the mouth and the soft tissues of the face. A piece of

vegetation resembling a corn husk was wedged in the upper throat.

The medical opinion was that direct blows to the head by a blunt object or a fist caused the extensive injuries in that area. The medical examiner further testified that the twig caused perforation of the abdominal cavity, either at the time of death or just after the victim died. The other vaginal injuries were caused by the penetration of "a firm, cylindrical object, anything from three, four to five, six inches in circumference and penetrating for up to about two or three inches." He opined that the injuries to the knees were consistent with falling down and being pushed down repeatedly.

Finally, the medical examiner testified to the cause of death as follows: "She died as a result of shock from bleeding and aspiration of some of the blood; that is, bleeding into the windpipe, swallowing, inhaling the blood into the windpipe and bleeding and shock and hemorrhaging resulting from blunt-force blows about the head and face." She died, he opined, within several hours after eating a meal.

On the evening of the child's disappearance, the defendant, who had worked in the trailer park but lived nearby in the Sandbridge area, was seen in the bookmobile during the period between 6:30 p.m. and 7:30 p.m. About 10:30 p.m. he entered a Seven-Eleven store that was located across the street from the bookmobile. He was "covered in blood." There was blood on his face, arms, and clothes. The fly to his trousers was unzipped. There was blood on the trousers about the opening. He told the store clerk, whom he knew, that he had been "rolled" by two men who had "beat him up." Defendant said that his arm and ribs had been injured in the fight. After helping defendant clean the blood from his person, the clerk called the police. The defendant left the store before officers arrived.

The accused was taken into custody by the Virginia Beach Police and the first of a series of interviews with the police began shortly after 8:00 p.m. on Friday, January 14. Clozza was arrested on a warrant that was executed about 11:30 p.m. that day.

Initially, defendant denied any involvement with the child. Then, over a period of time, he admitted the crimes with which he was charged, finally admitting the rape of the victim in an interview that he initiated with the police on June 27, 1983. The series of confessions reveal the following account of this tragedy.

Clozza had observed the child, who appeared to him to be older than 13 years, carrying books in the area of the bookmobile. He said he had consumed 15-16 beers earlier in the day but that he was not intoxicated at the time of the offenses. He stated that he followed her to a point near the front of her residence, "grabbing" her from behind and putting his hand over her mouth and on her arm. He forced her behind a trailer home and told her to remove her coat and shirt. She complied, and he struck her several times. She began to bleed about the mouth. He told her to remain quiet. He forced her to walk through the residential area to the edge of the field. There, he ordered her to remove her coat again and her bra. He struck her three times after she followed his directions. He said that she was "[n]ot very badly" injured at that time, but it was "possible" that her teeth had been knocked loose.

Then, they started across the field and after they had walked one-fourth of the way across, the child ran, trying to escape. Clozza caught her, struck her twice while she was standing and forced her to disrobe. She fell to the ground and he hit her three or four times while she was on the ground. He stated he raped her at that point and ejaculated on the ground. He did not remove his clothes but unzipped his trousers. He said her condition then was "fair," but he thought her nose was broken and that she was "missing" several teeth.

Next, while the child was on the ground, Clozza forced her to commit an act of fellatio on him. Then, he pulled her to her feet and pushed her toward the wooded area. He stated that she was not speaking to him, but that he probably was saying, "isn't this nice or I'm having fun or something on that order."

As they reached a hill where the tree line begins, Clozza struck her and made her commit fellatio again. He said her condition was "poor" at that time, she was bleeding from her nose and mouth, and one eye was swollen closed. Next, he "put a stick in her mouth," and another in her vagina. Asked by the interrogator the purpose of placing the stick in her vagina, Clozza answered: "I don't know. Maybe cruelty."

They continued on a path in the wooded area with the defendant striking the child in the back of the head and then in the face. Finally, she fell and, according to Clozza, her condition was "very poor." At this point, Clozza stated, he ordered the child to get up and to go down an embankment. He said that he did not give her an opportunity to comply but that he pushed her "down

into the valley" when he saw a light from a flashlight approaching him at a distance. Clozza stated that he left the area, walked back down the path, and went to the Seven-Eleven store.

The defendant argues that the evidence fails adequately to corroborate his confession as to the rape, which, of course, is an integral part of the capital murder charge. He points out that at all other times, including during his testimony at trial, he either denied he raped the child or stated he did not know whether he committed the rape. He notes that the forensic evidence failed to confirm that a rape occurred. He also notes that he became suicidal after his arrest, which resulted in treatment on two occasions before the trial at Central State Hospital. He says that his June confession to the rape was but another effort to commit suicide because of the remorse he was suffering over the other heinous acts he committed. We conclude the confession has adequate corroboration.

When, as here, the commission of the crime has been fully confessed by the accused, only slight corroborative evidence is necessary to establish the corpus delicti. *Campbell* v. *Commonwealth*, 194 Va. 825, 833, 75 S.E.2d 468, 473 (1953). The corroborative evidence in this case is more than slight; it is abundant. The medical testimony indicated that the vagina had been bruised by penetration of a firm cylindrical object three to six inches in circumference to the depth of two or three inches. According to the medical examiner, these injuries were not caused by insertion of the stick. In addition, the external injuries in the vaginal area are consistent with occurrence of rape. Even though a forensic scientist found no evidence of semen in any body cavity, this corroborates defendant's statement that he ejaculated on the ground; the defendant said he "did not come inside her because he was scared he would get caught."

Moreover, discovery of the child's clothing strewn across the field confirms Clozza's statements that he forced her to disrobe. It is reasonable to infer that the reason he caused her to undress was to rape her; she did not have to remove her trousers and underpants to perform fellatio. Furthermore, as the Attorney General suggests, Clozza's act of inserting the stick into the vagina with such force that it perforated the abdominal wall may have been motivated by more than cruelty; he may have attempted to mutilate the child to hide the evidence of rape, given the fact that "he was scared he would get caught." Accordingly, evidence extrane-

ous to the confessions points directly to the commission of rape by the accused.

In support of his argument that the evidence fails to establish premeditation, defendant contends that his acts of going to a public place, covered with blood, and his other post-crime conduct established a lack of awareness that he had killed the child. Thus, he says, he could not have had the intent to kill necessary for proof of capital murder. We do not agree.

The question whether a defendant is guilty of a wilful, deliberate, and premeditated killing of the victim is usually a question for the jury to determine from all the facts and circumstances. *Smith* v. *Commonwealth*, 220 Va. 696, 701, 261 S.E.2d 550, 553 (1980). The intention to kill need not exist for any specified length of time prior to the actual killing. *Akers* v. *Commonwealth*, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980). In deciding the question, the jury properly may consider the brutality of the attack, whether more than one blow was struck, the disparity in size and strength between the accused and the victim, the concealment of the victim's body, and the defendant's efforts to avoid detection. *Epperly* v. *Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892 (1982). When each of the foregoing factors is applied to the present case, the evidence manifestly is sufficient to prove premeditation.

The defendant's conduct belies his claim that he did not intend to kill the child. The cruelty and inhumanity of the continuous beating of this helpless child for at least a two-hour period by an apparently healthy young adult male need not be detailed again to support our analysis of this issue. As the egregious conduct worsened while the pair progressed across the field, the jury properly could have concluded under the evidence that Clozza knew he had to kill the child to escape detection; before he pushed her down the embankment, he asked her whether she knew him. The body was concealed among undergrowth at the bottom of the hill. The defendant sought to avoid detection by leaving the Seven-Eleven store before police arrived and concocted a story about a beating by two men when questioned by the store clerk and, initially, by the police. There was ample evidence for the jury to find that the

defendant decided, at some point during the two-hour period, to kill the child, and that he carried out this homicidal design.

Next, defendant contends the trial court erred in permitting introduction during the guilt phase of two color photographs taken by the medical examiner depicting injuries to the victim's face and the damage caused to the inside of her lips. He says they were inflammatory and their prejudicial nature outweighed their probative value. We reject this contention.

The admissibility of photographs is a matter that lies in the sound discretion of the trial court, and the court's ruling will not be disturbed absent a clear abuse of discretion. *Stockton* v. *Commonwealth*, 227 Va. 124, 144, 314 S.E.2d 371, 384 (1984). Even though the Commonwealth had other evidence to establish the elements of capital murder, "the photographs portrayed more graphically, but not more inflammatorily, than the testimony of [the witnesses] the methodical manner in which the killing of the victim was accomplished." *Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert. denied*, 442 U.S. 924 (1979). Accordingly, they were relevant and material to establish premeditation and malice and to establish the degree of atrociousness of the crime. *Id.*, 251 S.E.2d at 208.

Next, the defendant complains about two allegedly erroneous rulings of the trial court made during the penalty phase of the trial. As a Westland, Michigan, police officer was called to the witness stand to authenticate documents concerning Clozza's prior conviction of a sex offense in Michigan in 1979, a female juror advised the court that she knew the prospective witness. The juror explained to the court that in 1972, before she moved to Virginia in 1973, she worked part-time as a clerk-typist for the Westland Police Department. She stated that she was familiar with the location of the defendant's prior offense, the ladies' room of a drive-in movie theater. The juror said that this development would not affect her impartiality in any way. The officer never testified because the records were independently authenticated. The defendant argues that the juror's prior association with the police department should have been disclosed during voir dire and that because such association was revealed during the trial, the court should have declared a mistrial. We disagree.

The juror was not asked on voir dire any question which would have caused her to disclose her Michigan connections. Moreover, discovery by a juror during the trial that he or she

knows a witness or is acquainted with the situs of an event in the case is not ground for a mistrial when there is no indication that the juror's objectivity will be affected. The trial court has discretion to determine whether such prior relationship adversely impacts the juror's ability to render a fair and impartial verdict. There was no abuse of discretion here.

The defendant contends the trial court erred in overruling his objections to the allegedly improper and prejudicial argument made by the prosecutor during the penalty phase. Specifically, defendant argues the prosecutor should not have been permitted during closing argument in rebuttal to make " 'a plea on behalf of Patty Bolton' . . . thus allowing and inviting the jury to make arbitrary comparison to the victim's and Mr. Clozza's character." He says the prosecutor's statements were calculated to inflame and prejudice the jury against the defendant. The trial court ruled the argument was proper rebuttal in view of the closing argument made by defense counsel. We agree.

The prosecutor's argument that is attacked by defendant was in response to defense counsel's argument that focused on mitigating factors which would cause the jury to impose a life sentence instead of death. The whole tenor of defense argument was to encourage the jury to spare Clozza's life because he is a "human being" who is sorry for committing the crimes, and that his life should be spared. "You can forgive," said counsel and, "You can let him live," he pleaded. "You know when you search your conscience and your heart that you can do that." Counsel told the jury that Clozza "is a bundle of problems." Counsel stated that after Clozza was told by the police that the child was dead, Clozza cried. Counsel argued that because he cried and because he confessed, "[t]here is a heart in there and it works just like ours on some occasions." Continuing, defense counsel said:

"There is a soul in there that matches the one that we have got. It was clean originally at birth. Give him the opportunity.

"For the sake of God, give him the opportunity to repent, to cleanse that soul and to save it. Give him that chance. Don't kill him. Don't kill him, please. Don't do what he did to Patty."

The portions of the prosecutor's argument about which the defendant complains, to which prompt, specific objection was made, were as follows:*

"Mr. Sciortino [Commonwealth's Attorney]: I will stand here and make, I hope, as impassioned a plea on Patty Bolton's behalf as Mr. Legler [defense counsel] has made for his client, the defendant.

. . . .

"Patty Bolton had a soul. Was the defendant worried about that, that night? Patty Bolton was thirteen years old. She was studious. You know that from the fact that she went to the bookmobile regularly. You know that she got books to read. She was a voracious reader.

"Patty Bolton had aspirations. Patty Bolton had a right to finish school. Patty Bolton had a right to become an adult, to fall in love, to get married, if that is the way it went; to have children, to see her children grown, to know her grandchildren.

"Her family, her mother, her father, had a right to all of those things. Her relatives had the same rights."

In rebuttal argument, a prosecutor has the right to answer the argument made by defense counsel and to refer to evidence and fair inferences suggested by the evidence touching the subjects covered by the adversary. *Timmons* v. *Commonwealth*, 204 Va. 205, 216-17, 129 S.E.2d 697, 705 (1963). In the present case, the defendant's attorney chose to argue to the jury on a personal basis, imploring the panel to dwell on the defendant as a human being that should be spared death because of his human qualities; counsel even invited the jury to join him as he recited the Lord's Prayer. Consequently, in this sentencing phase of the bifurcated trial, it was proper for the prosecutor to respond in the same personal context by pointing out the human qualities of the victim and her family relationship.

In conclusion, Code § 17-110.1 requires this Court, in addition to any errors enumerated by appeal, to consider and determine whether the death sentence "was imposed under the influence of

---

* Other portions of the argument have been attacked on appeal, but no prompt, specific objection was made at the trial. We will take no further notice of those objections made for the first time on appeal. Rule 5:21.

passion, prejudice, or any other arbitrary factor," and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Clozza argues that the inflammatory nature of the prosecutor's closing rebuttal argument impelled the jury to act out of passion and prejudice to impose arbitrarily the extreme penalty. We disagree with that contention. We have addressed already the allegedly erroneous rebuttal argument. Furthermore, the quality and quantity of the evidence of this henious crime fully supports assessment of the death penalty, which was based on both the vile nature of the offense and the likelihood that the defendant would commit future acts of violence that would constitute a serious threat to society. There is not one scintilla of suggestion that the jury acted passionately, prejudicially, or arbitrarily in arriving at the sentence to death.

Upon the questions of excessiveness and disproportionality, we have examined the records in all capital murder cases reviewed by this Court to determine "whether generally in this jurisdiction triers of fact 'impose the death sentence for conduct similar to that of the defendant.' " *Giarratano* v. *Commonwealth*, 220 Va. at 1079, 266 S.E.2d at 103 (quoting *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied,* 445 U.S. 972 (1980)). The examination discloses that this sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering this crime and this defendant. Actually, there are no other cases in our records that have involved conduct as despicable as the acts of this defendant. One case approaching the atrociousness of the present case is *Fitzgerald* v. *Commonwealth, supra,* in which the defendant tortured the victim by slashing her with a machete and knife, followed by comprehensive mutilation. But in that case, the adult victim was dealing in drugs and apparently had "ripped off" Fitzgerald. Here, we have an innocent child who was engaged in a normal pursuit in her own neighborhood. She was accosted by a stranger in front of her home, and repeatedly was brutalized for no apparent reason other than the sexual gratification of her assailant, who determined to silence the only witness to his crime.

For the foregoing reasons, we hold the trial court committed no error. Furthermore, we independently have concluded from a re-

view of the entire record that the sentence of death properly was assessed. Accordingly, the judgment below will be

*Affirmed.*