COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Senior Judges Clements, Haley and Petty

JAQUAN MOULTRIE

v.      Record No. 0457-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION*
PER CURIAM
NOVEMBER 22, 2022

FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
Dennis M. Martin, Sr., Judge

(Terry Driskill, on brief), for appellant. Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Victoria Johnson, Assistant Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court for the City of Petersburg convicted Jaquan

Moultrie of first-degree murder, in violation of Code § 18.2-32, and unlawful stabbing, in violation

of Code § 18.2-53. Moultrie asserts that the trial court erred in finding the evidence sufficient to

support his convictions. Moultrie's counsel has moved for leave to withdraw in accordance with

*Anders v. California*, 386 U.S. 738, 744 (1967). The motion to withdraw is accompanied by a

brief referring to the part of the record that might arguably support this appeal. A copy of that

brief has been furnished to Moultrie with sufficient time for him to raise any matter that he

chooses. Moultrie has not filed any supplemental *pro se* pleadings.

We have reviewed the parties' pleadings, fully examined the proceedings, and determined

that this appeal is wholly frivolous and wholly without merit as set forth below. Thus, the panel

unanimously holds that oral argument is unnecessary. *See* Code § 17.1-403(ii)(a); Rule 5A:27(a).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

Dajah "Daisy" Brown moved to Virginia with her boyfriend, Moultrie, in 2018. When she arrived, Brown secured employment as a live-in caregiver for two intellectually disabled adults, Ian Chambliss and Cassandra Embry, in a private home owned by her employer, Yolanda Thomas. Brown got along well with Thomas, and she had a good relationship with Chambliss and Embry. Brown's relationship with Moultrie, however, was less cordial.

On February 16, 2019, Brown called 911 to report that Moultrie was at her workplace trying to attack her. Then, on March 22, 2019, Chambliss called 911 to report that Moultrie was hitting Brown. Brown was screaming in the background during the call. Petersburg Police Officer Eric Richardson responded to the residence and noted that Brown "looked scared." Brown told Officer Richardson that she wanted Moultrie out of the house. After learning that Moultrie had an outstanding warrant, Officer Richardson arrested Moultrie and took him to Riverside Regional Jail. Moultrie became upset and angry during their interaction and repeatedly referred to Brown as "[t]hat stupid bitch." Officer Richardson described Moultrie as "yelling" and "growling." Moultrie was released on bond on March 22, 2019.

The next day, on March 23, 2019, Thomas took Brown shopping and to dinner and then dropped her back off at the residence at about 8:00 p.m. At that point, only Brown, Chambliss, and Embry were in the home. At about 2:20 a.m. on March 24, 2019, Brown spoke on the telephone to her friend, Steven Hewett. Hewett testified that Brown sounded frightened during the call as opposed to her "normal confident self." During that phone call, Brown told Hewett "if anything happened to her, that [Moultrie] did it."

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Scott v. Commonwealth*, 292 Va. 380, 381 (2016).

Later, Chambliss, who slept in the bedroom next to Brown's, heard Brown say, "He stabbed me." Chambliss went to investigate and saw Moultrie stab Brown in "the shoulder." At trial, Chambliss gestured to the "top of his left deltoid," when he pointed out the area of the stab wound on his own body. Chambliss described how Brown and Moultrie struggled in the upstairs bedroom and in Thomas's office—where she tried to call 911—before Moultrie dragged her down the stairs by her hair and "left her body there to die." Moultrie then fled the scene. Chambliss noticed damage to the front door, where Moultrie had kicked it in to enter the house. Brown was not breathing and, after an unsuccessful attempt to resuscitate her, Chambliss called 911. In the 911 call, which was played at trial, Chambliss reported that Brown's "boyfriend" had stabbed her. Before trial, Chambliss identified Moultrie as the assailant in a photo lineup. In court, Chambliss identified Moultrie as Brown's boyfriend and as the person who stabbed her.

Petersburg Police Officer James Knisley and Lieutenant Daniel Felthoff responded to the call and were the first officers on the scene. On arrival, they encountered Chambliss and Embry standing outside the residence. The officers observed that Chambliss and Embry both had an intellectual disability and were frightened and distressed. Chambliss told Lieutenant Felthoff that "Quan" had stabbed "Ms. Daisy" and had fled.

The officers discovered Brown lying faceup in the doorway with open, but fixed eyes, and disheveled clothing. She had a laceration just below her neckline with a wet, red stain on her shirt. Brown's pants were partially pulled down as if they had become displaced while her body was dragged. The officers also observed blood streaks on the wall of the stairwell leading upstairs. Upstairs, they found signs of a physical struggle including items "thrown around" and a broken lamp. They observed blood spatter on "the lower left portion" of the bed in Brown's bedroom in the area where Chambliss said Brown was standing when Moultrie stabbed her. They also recovered Moultrie's identification and bond paperwork from the dresser in Brown's

- 3 -

room.  Thomas later testified that there was damage to the front door and that portions of the interior of the home were in disarray; she described her office as "upside down."

The medical examiner testified that Brown suffered a single stab wound below her right clavicle that extended three inches into her body, entering the pericardial sac and injuring the great vessels of the aorta and pulmonary trunk as well as the heart itself.  Brown would have been able to survive for approximately ten minutes, depending on the rapidity of the blood loss.  She suffered significant internal bleeding.

At trial, Moultrie cross-examined Chambliss regarding his physical and mental health diagnoses, his preliminary hearing testimony, and inconsistencies in his statements.  On redirect, Chambliss explained that due to his "mild retardation," he sometimes becomes confused when answering questions, but that he was not confused about who stabbed Brown.  Chambliss reiterated that he saw Moultrie stab Brown one time; she tried to go to the office, and then, after she stopped moving, Moultrie dragged her down the stairs by her hair.  Chambliss further testified that he knew the difference between the truth and a lie.

Moultrie moved to strike the evidence, arguing that Chambliss's testimony was inherently incredible and that the Commonwealth did not prove the element of premeditation. The trial court denied the motion and convicted Moultrie of both charges.  In doing so, the trial court specifically found Chambliss's testimony credible, stating that it had "evaluated the appearance and attitude and behavior of Mr. Chambliss" as well as

> any interest that he might have in the outcome of this case, any relation that he might have to any party in the case, his inclination for him to speak truthfully or not, the probability or improbability of his testimony, and most importantly, all the other facts and circumstances in evidence.

The trial court further concluded that the Commonwealth proved the element of premeditation.  First, the court found that the evidence established "prior instances of violence

- 4 -

between the defendant and the victim." Second, the evidence established that the victim made a statement shortly before the murder that if something were to happen to her, "it's the defendant who did it." Third, the court found that the circumstances of the killing were indicative of premeditation and concluded, "[i]t is clear that the defendant had the design to willfully, premeditated, and deliberately kill the victim." This appeal followed.

## STANDARD OF REVIEW

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

## ANALYSIS

### I. Identity of the Perpetrator

Moultrie first contends that the trial court erred in finding the evidence sufficient to prove he was the perpetrator of the crimes "as the only direct evidence of identity was provided by [Chambliss's] conflicting accounts of events." We disagree.

It is well-settled that "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Taylor v. Commonwealth*, 256 Va. 514, 518 (1998)). "[W]here a trial court sitting without a jury hears witnesses testify and observes their demeanor on the stand, it has the right to believe or disbelieve their statements." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005) (quoting *Morning v. Commonwealth*, 37 Va. App. 679, 686 (2002)). Thus, "[g]reat deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Id.* (alteration in original) (quoting *Walton v. Commonwealth*, 255 Va. 422, 426 (1998)). This Court must accept the factfinder's "determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). That is, "[c]onflicts in the evidence are resolved by the fact finder, and such conflicts are not revisited on appeal unless 'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but

one conclusion.'" *Molina v. Commonwealth*, 47 Va. App. 338, 369 (second alteration in original) (quoting *City of Bedford v. Zimmerman*, 262 Va. 81, 86 (2001)), *aff'd*, 272 Va. 666 (2006).

Moultrie asserts that Chambliss's testimony was inherently incredible because he made inconsistent statements about the stabbing and because he testified that the victim was stabbed in the shoulder rather than in the chest. However, the record affirmatively shows that Chambliss was in the house at the time of the murder and that he repeatedly and consistently said that he saw Moultrie stab Brown. In fact, Chambliss identified Moultrie as the perpetrator during his 911 call, again at the scene of the crime, during a subsequent photo lineup, and when he was under oath both at the preliminary hearing and at trial. Moreover, Chambliss's testimony was corroborated by the crime scene, which bore signs of a struggle in an upstairs bedroom and in Thomas's office where Chambliss said Brown went to call 911. The evidence of a struggle is consistent with the medical examiner's testimony that Brown would have survived for ten minutes after suffering the stab wound. Blood spatter was found on the bed in the location where Chambliss said Brown was standing when Moultrie stabbed her, and streaks of blood were located on the stairwell wall. Brown's pants were partially pulled down, suggesting they had become displaced while her body was dragged, and there was a *wet* blood stain on her shirt when police arrived on scene. Moreover, the police found Moultrie's identification and bond paperwork in an upstairs bedroom, indicating his presence at the crime scene.

With respect to the stab wound itself, Chambliss testified at trial that Moultrie stabbed Brown once and pointed to the "top of his left deltoid." The trial court expressly found that Chambliss's testimony was reasonable, because the medical evidence indicated that Brown was stabbed "more under the clavicle which is not too far from the deltoid." It is of no moment that Chambliss gave inconsistent statements regarding multiple stab wounds. Chambliss explained that because of his mild retardation he sometimes became confused about the questions asked.

Additionally, the trial court was apprised of his intellectual disability and was made aware of any inconsistencies in his testimony. After considering all of the evidence presented at trial, the trier of fact resolved the inconsistencies in Chambliss's testimony in favor of the Commonwealth and concluded that Chambliss's testimony was not inherently incredible or unworthy of belief. The record supports that conclusion.

It is true that the Commonwealth "bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). However, on appeal, we review the trier of fact's determination regarding the identity of the criminal actor in the context of "the totality of the circumstances." *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 249 (1992)). In this case, the trial court carefully evaluated Chambliss's testimony and expressly considered all of the facts and circumstances surrounding the murder, including the significant amount of corroborating evidence supporting Chambliss's version of events. In the end, the trial court resolved the inconsistencies in Chambliss's testimony in favor of the Commonwealth and found, as a matter of fact, that Chambliss testified truthfully about what he saw. Because the trial court's findings are not plainly wrong, or without evidence to support them, we will not disturb them on appeal.

## II. Premeditation

Moultrie also contends that the evidence failed to prove he acted with the requisite premeditation necessary to prove first-degree murder. He argues that the circumstances described by the witnesses more particularly described "a crime of passion." Again, we disagree.

"Murder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree, punishable as a Class 2 felony." Code § 18.2-32. "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a

specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Id.* (alterations in original) (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004)). "The intention to kill need not exist for any specified length of time prior to the actual killing." *Aldridge*, 44 Va. App. at 655 (quoting *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984)). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Clozza*, 228 Va. at 134). "[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994).

Here, as the trial court found, the circumstances that proved Moultrie acted with premeditation included the history of violence between Moultrie and Brown, Brown's statement to a friend only hours before the murder that, if anything were to happen to her, Moultrie would be responsible, and the circumstances of the murder itself. Indeed, the record establishes that Moultrie, who was angry with Brown and referred to her as "[t]hat stupid bitch," returned to the house shortly after he was released on bond from the incident from the day before, when a frightened Brown spoke to the police and Moultrie was arrested. The facts established that Moultrie broke into the home, started an argument with Brown, and engaged in a lengthy struggle, before stabbing her in the upper chest, resulting in the fatal wound to her heart. Rather than calling for help or providing any assistance to Brown, Moultrie dragged Brown down the stairs by her hair and left her bleeding on the floor. He then fled. Contrary to Moultrie's assertion, the record contains no evidence of provocation.

- 9 -

The evidence presented at trial clearly supported the trial court's finding that this was a willful, deliberate, and premeditated killing.  Moultrie intended to kill Brown, and he did.

CONCLUSION

Accordingly, we affirm the trial court's judgment and grant the motion for leave to withdraw.  *See Anders*, 386 U.S. at 744.  This Court's records shall reflect that Jaquan Moultrie is now proceeding without the assistance of counsel in this matter and is representing himself on any further proceedings or appeal.

*Affirmed.*