COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Athey and Callins
Argued at Richmond, Virginia


CALVIN MAURICE REYNOLDS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0490-24-2            JUDGE DOMINIQUE A. CALLINS
                                                         JUNE 17, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CAROLINE COUNTY
Sarah L. Deneke, Judge

Dennis J. McLoughlin, Jr. (McLoughlin Law PLC, on briefs), for
appellant.

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Calvin Reynolds was convicted of first-degree murder. On appeal,

Reynolds argues that the trial court erred by refusing his proposed jury instruction on involuntary

intoxication,[1] granting the Commonwealth's proposed jury instruction on inferring malice from

the use of a deadly weapon, and denying his motion for a new trial. Reynolds also argues that

the evidence was insufficient to convict him of first-degree murder. For the following reasons,

we affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] At oral argument, Reynolds's counsel withdrew his assignment of error on the
involuntary intoxication instruction as without merit, so we will not address it.

BACKGROUND[2]

On October 10, 2021, Caroline County Sheriff's Deputy Matthew Wilcox responded to a call for service at a residence on Macedonia Road in Caroline County. Upon arriving, Deputy Wilcox observed "a considerable amount of people" standing in front of the residence at that location, a lot of whom appeared to be "viscerally upset," as if they were in a "fog or haze" over "the whole situation." Deputy Wilcox observed an individual later identified as Warren Baker leaning on his right side near some trash and cans with a significant amount of blood pooling around his head. Deputy Wilcox rolled Baker over onto his back and observed "massive" damage to Baker's face. The deputy provided lifesaving intervention in the form of chest compressions but could not make "rescue breathing" efforts because of Baker's facial damage. Baker died at the scene.

Witnesses identified Reynolds as the person who inflicted Baker's injuries and told Deputy Wilcox that Reynolds was inside the residence. After the police used a microphone for over an hour to ask Reynolds to exit the house, a Special Emergency Response Team ("SERT") was called to the scene. The SERT eventually entered the residence, located Reynolds, and arrested him. As Deputy Wilcox transported Reynolds to jail, he saw that Reynolds's hand was bruised, scratched, and bloody. Deputy Wilcox also noticed that Reynolds was "very coherent" and alternated between a "calm demeanor" and a "very aggressive demeanor." Reynolds was able to walk normally and appeared to understand all of Deputy Wilcox's instructions. During

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

the ride to detention, Deputy Wilcox stopped at a local store and called for emergency assistance after he heard "loud banging" in the back seat and noticed that Reynolds's face was "buried in the cage" and that Reynolds was "not responding" to him. After Deputy Wilcox was finally able to "awaken" Reynolds, he "just kept staring and smiling." When they arrived at the jail, Reynolds lunged at Deputy Wilcox and said, "I'm going to bite your g****** nose off you poindexter looking mother f*****."

At trial, Jajuan Lewis testified that he had known Reynolds all his life. Lewis testified that on the day of the killing he went to the residence on Macedonia Road to pick up Reynolds. While there, Lewis, Reynolds, Baker and others sat around outside smoking marijuana. Lewis did not notice anything unusual about the marijuana and testified that it had its usual effect. Lewis heard Reynolds ask Baker about "some bread or something, some money," but the two were not hostile or arguing. Lewis observed that Reynolds appeared physically fine—not falling down or slurring his speech at all. Eventually, Lewis entered his car, said goodbye, and started to leave. Suddenly, Reynolds swung at Lewis through the open car window, causing Lewis to knock his car out of gear and roll down the driveway. Lewis grabbed Reynolds's arm but eventually let it go and was able to put the car back in gear and drive away. Reynolds said nothing during this exchange, but Lewis told Reynolds not to call him again until Reynolds was "ready to go to rehab."

Horatio Irvin testified that he lived in the garage at the residence on Macedonia Road and was outside with Reynolds and the others on the day of the murder. Irvin was preparing to barbecue, and they were all drinking beer and smoking marijuana outside the house. Irvin testified that there was nothing abnormal about the marijuana and that he felt what he normally feels after smoking marijuana. At some point, Baker arrived and joined the group. Initially, everyone was "in a good mood," but later Irvin observed Reynolds and Lewis's altercation at the

car.  Irvin watched as Reynolds punched Lewis through the car window "[t]he entire way down the driveway."  After Lewis left, Reynolds walked back up the driveway steady on his feet, not saying anything.  At that point, Baker was leaning on his car and asked Reynolds, "why did you trip out?"  Reynolds responded, "you want some of this here?" and then punched Baker in his head "[s]traight to the dome" three times.  The three punches "knocked out" Baker, causing him to fall down.

At this point, the other guests scattered away, and Irvin retreated to the garage.  From the garage, Irvin saw Reynolds immediately pick up a small metal folding chair and begin hitting Baker "pretty hard" in the head with it.  Irvin observed that the chair was a "little doll chair" with "the Frozen girl" on it.  Reynolds struck Baker "more than ten, fifteen times" in the head with the chair as Baker lay unmoving on the ground.  Reynolds kept hitting Baker until the chair "broke up in multiple pieces and [he] couldn't use it" anymore.  Reynolds then grabbed a wooden stool and struck Baker multiple times with it.  At that point, Carlton Walker, Sr., ("Walker Sr.") approached Reynolds and asked him to stop.  But by that time, Baker's head was already "splattered open like a watermelon."  After Reynolds finally stopped, he entered the residence until the police arrived.

Reynolds's first cousin, Carlton Walker, Jr. ("Walker Jr."), testified that he had known Reynolds all his life.  Walker Jr. testified that he was at the residence on Macedonia Road on the day of the killing, just "hanging out" with everyone.  Walker Jr. observed that Reynolds seemed "a little quieter than usual" but otherwise appeared to be acting normally that day.  When Lewis began to leave, Walker Jr. observed Reynolds, "out of a rage, just started swinging at" Lewis through Lewis's car window.  As Reynolds walked back toward the house, Walker Jr. asked Reynolds what happened, and Reynolds "bucked" at Walker Jr., which "intimidated" him.  Walker Jr. retreated to the garage and then looked back and saw Reynolds talk with and then

punch Baker. After seeing Reynolds punch Baker twice, Walker Jr. told Irvin to call 911. Walker Jr. did not try to help Baker because he was afraid of Reynolds. Walker Jr. then saw Reynolds hit Baker multiple times with the metal folding chair. Walker Jr. observed that Reynolds "didn't seem like himself," "snapped out of nowhere," and had an "empty stare." Walker Sr. eventually exited the residence and pushed Reynolds away from Baker. Reynolds had a "blank stare" and seemed "like he was confused as to what just happened" before silently entering the residence.

Caroline County Sheriff's Investigator Aaron Garthaffner was called to the residence and documented evidence retrieved from the crime scene. Investigator Garthaffner took photographs of the residence, the property, Baker's body, and Reynolds's hands. He also collected the "mangled" pieces of the metal chair, which had a large amount of blood on them. Baker's hat and dentures were found on the ground near where the killing occurred. Investigator Garthaffner sent the bloody chair pieces to the Department of Forensic Science for analysis. A certificate of analysis later confirmed that Baker's DNA was on various parts of the chair, and Reynolds's DNA was found in a DNA mixture extracted from the chair seat. Paint chips from the chair were recovered from Baker's body during his autopsy.

Caroline County Sheriff's Sergeant Benjamin Sadler was another officer who arrived at the crime scene. They entered the residence and found Reynolds in the back bedroom. Except for a dim kitchen light, the lights in the house were turned off, and Reynolds was lying in the bed and appeared to be asleep. Sergeant Sadler placed handcuffs on Reynolds before waking him. Reynolds was then taken into custody and transported to the sheriff's office for an interview. While waiting in the interview room, Reynolds twice fell out of his chair and had to be helped back up. During the interview, Reynolds stated that he had "shot a little meth earlier in the morning" and that he "thought he had a dream about" hitting Baker. Sergeant Sadler interviewed

Reynolds a second time on the morning after the murder. During the second interview, Reynolds stated that "he used his hands" to kill Baker, that "everybody in the yard . . . told him to kill" Baker, that Lewis had told Reynolds that Baker had raped Reynolds's aunt, that he used methamphetamine on the day of the murder, and that he thought the events of that day were a "dream."

After the Commonwealth rested its case-in-chief, Reynolds moved to strike, arguing that the Commonwealth failed to prove that he acted with premeditation in killing Baker. Reynolds also argued that the evidence failed to prove that he acted with malice because Reynolds possibly had a "mental health break" or was "roofied" before killing Baker. The trial court denied the motion to strike. Reynolds did not present evidence and renewed his motion to strike, which the trial court again denied.

Before closing arguments, the parties reviewed the proposed jury instructions. Reynolds objected to the Commonwealth's proposed jury instruction permitting the jury to infer malice from the use of deadly weapon, arguing that a chair is not a deadly weapon akin to a gun or knife. The trial court overruled the objection, finding that it was for the jury to determine whether the chair was a deadly weapon, given the manner and circumstances in which it was used and whether it was likely to cause death or great bodily injury. The Commonwealth then objected to Reynolds's proposed jury instruction stating that the jury should find him not guilty if he was involuntarily intoxicated at the time of the murder. The trial court denied the instruction, finding that there was no evidence that Reynolds became involuntarily intoxicated by

the false contrivance of others before the murder.[3]  The jury ultimately found Reynolds guilty of first-degree murder.

Before sentencing, Reynolds moved for a new trial, arguing that the Commonwealth had suppressed favorable information to him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  After a hearing, the trial court denied the motion.  On October 25, 2023, the trial court entered a final order sentencing Reynolds to 65 years of imprisonment with 20 years suspended.  This appeal followed.

## ANALYSIS

### I.  Deadly Weapon Jury Instruction

"The purpose of any jury instruction is to inform the jury of the law guiding their deliberations and verdict."  *Morgan v. Commonwealth*, 50 Va. App. 120, 132 (2007) (quoting *Keen v. Commonwealth*, 24 Va. App. 795, 807 (1997)).  "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'"  *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)).  "The trial court has 'broad discretion in giving or denying instructions requested,' and we review those decisions under an abuse of discretion standard."  *Barney v. Commonwealth*, 69 Va. App. 604, 609 (2019) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)).  But "whether a jury instruction accurately states the relevant law is a question of law that we review de novo."  *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

---

[3] The jury was nevertheless given an instruction on voluntary intoxication, which stated that "[i]f you find that the defendant was so greatly intoxicated by the voluntary use of drugs that he was incapable of deliberating or premeditating, then you cannot find him guilty of murder in the first degree."

The Commonwealth offered the following jury instruction on inferring malice from the use of a deadly weapon, which the trial court permitted:

> You may, but are not required, to infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed. A deadly weapon is any object or instrument, not part of the human body, that is likely to cause death or great bodily injury because of the manner and under the circumstances in which it is used.

Reynolds argues that the trial court erred in granting this instruction, asserting that there is nothing inherent to the objects he used to kill Baker—a "little doll's chair" and a wooden stool—that makes them likely to cause death or great bodily injury. Reynolds asserts that these objects cannot meet the definition of a deadly weapon, and thus the trial court erred in instructing the jury that it could infer malice from the use of a deadly weapon.

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Alston v. Commonwealth*, 77 Va. App. 639, 648 (2023) (quoting *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012)). "It exists when a person commits 'any purposeful and cruel act without any or without great provocation.'" *Id.* (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020)). Malice "may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)). "Whether an accused acted with malice 'is generally a question of fact and may be proved by circumstantial evidence.'" *Logan v. Commonwealth*, 67 Va. App. 747, 756 (2017) (quoting *Knight v. Commonwealth*, 61 Va. App. 148, 156 (2012)).

Malice may also "be inferred 'from the deliberate use of a deadly weapon.'" *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Doss v. Commonwealth*, 23 Va. App. 679, 686 (1996)). "A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly

often depends more on the manner in which it has been used than on its intrinsic character." *Hampton v. Commonwealth*, 34 Va. App. 412, 419 (2001) (quoting *Pannill v. Commonwealth*, 185 Va. 244, 254 (1946)). "Generally, unless a weapon is per se a deadly one, the fact finder should determine whether it, and the manner of its use, place it in that category, and the burden of showing these things is upon the Commonwealth." *Id.* at 420 (quoting *Pritchett v. Commonwealth*, 219 Va. 927, 929 (1979)).

We hold that the trial court did not abuse its discretion in allowing the jury instruction permitting the jury to infer malice from the use of a deadly weapon. Although the objects that Reynolds used against Baker—a child's chair and a wooden stool—are not inherently designed or intended for such violence, the evidence showed that the child's chair was made from metal and that Reynolds used it to violently bludgeon Baker to death as he lay on the ground after having been knocked down by Reynolds's initial punches. As Baker lay on the ground, Reynolds used the chair to strike Baker repeatedly on his head with such force that he suffered massive facial damage, causing his head to look "splattered open like a watermelon." Reynolds's use of the chair left it completely mangled with a large amount of Baker's blood on multiple pieces that were collected from the crime scene. If that were not enough, Reynolds then picked up a wooden stool and continued to strike Baker, who was then unconscious on the ground, ultimately killing him. The jury could have reasonably found that, given the manner in which Reynolds used the chair and stool to bludgeon Baker to death, these objects were likely to cause death or great bodily injury to Baker, and thus these objects were deadly weapons. Accordingly, the trial court did not abuse its discretion in granting the jury instruction on inferring malice from the use of a deadly weapon.

II. Sufficiency of the Evidence

Reynolds argues that the evidence was insufficient to support his conviction for first-degree murder. Pointing to his erratic behavior, his consumption of drugs, and his use of seemingly innocuous objects to kill Baker, Reynolds asserts that the evidence failed to prove that he acted with malice or that the murder was willful, deliberate, and premeditated.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Instead, we ask only 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Secret*, 296 Va. at 228). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Malicious homicide rises to the level of first-degree murder if the Commonwealth proves that the homicide was "willful, deliberate, and premeditated." Code § 18.2-32. "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (alterations in original) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Epperly v. Commonwealth*, 224 Va. 214, 231

(1982) (quoting *Smith v. Commonwealth*, 220 Va. 696, 700 (1980)). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980)). "[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994). "In deciding the question [of premeditation], the jury properly may consider the brutality of the attack, whether more than one blow was struck, the disparity in size and strength between the accused and the victim, the concealment of the victim's body, and the defendant's efforts to avoid detection." *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984).

We hold that the evidence was sufficient to prove that Reynolds acted with malice in killing Baker and that the murder was willful, deliberate, and premeditated. As explained in Section I, *supra*, the trial court properly instructed the jury that it could infer malice from the use of a deadly weapon, and thus the jury could have rationally found that Reynolds acted with malice in bludgeoning Baker to death with the metal chair and wooden stool. The jury could also have considered the sheer brutality of the attack and the repeated blows that Reynolds rained on Baker as he lay on the ground—leaving Baker with massive, fatal wounds to his head—and rationally concluded that Reynolds acted willfully, deliberately, and with premeditation in killing Baker. Further supporting this conclusion is the fact that Reynolds was under little to no provocation from Baker, as Reynolds and Baker were not hostile or arguing earlier that day, and Baker merely asked Reynolds, "why did you trip out?" after the altercation between Lewis and Reynolds. Finally, the jury could have rationally rejected Reynolds's theory that his voluntary use of marijuana and methamphetamine that day caused him to completely lose control of his actions and rendered him incapable of acting willfully, deliberately, and with premeditation in

killing Baker. Accordingly, the evidence was sufficient to prove that Reynolds committed first-degree murder.

### III. Motion for a New Trial

Reynolds argues that the trial court erred in denying his motion for a new trial based on the alleged *Brady* violation by the Commonwealth. We decline to reach this assignment of error because the relevant transcript was not timely filed in the trial court, and we find the transcript to be indispensable to resolving this issue on appeal.

"The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court no later than 60 days after entry of the final judgment." Rule 5A:8(a). "This deadline may be extended by a judge of this Court only upon a written motion filed within 90 days after the entry of final judgment." *Id.* "Timely motions will be granted only upon a showing of good cause to excuse the delay." *Id.* "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii). "If . . . the transcript [or statement of facts] is indispensable to the determination of the case, then the requirements for making the transcript [or statement of facts] a part of the record on appeal must be strictly adhered to." *Bay v. Commonwealth*, 60 Va. App. 520, 528 (2012) (alterations in original) (quoting *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986)). "This Court has no authority to make exceptions to the filing requirements set out in the Rules." *Id.* (quoting *Turner*, 2 Va. App. at 99). "Whether the record is sufficiently complete to permit our review on appeal is a question of law subject to our *de novo* review." *Id.* at 529.

Here, the trial court entered final judgment on October 25, 2023. Thus, under Rule 5A:8(a), the transcript was due on or before December 27, 2023.[4] Reynolds did not file the transcript of the hearing on his motion for a new trial until April 16, 2024, which was well past the December 27, 2023 deadline. He also did not file an extension of time to file the transcript. *See* Rule 5A:3(c). Because Reynolds did not timely file the relevant transcript, we cannot consider it to evaluate this assignment of error, and we therefore must determine whether the transcript is indispensable to resolve this assignment of error. *See Bay*, 60 Va. App. at 528. We conclude that the transcript is indispensable because it contains the specific reasoning of the trial court in denying Reynolds's motion for a new trial, without which we cannot properly evaluate the trial court's ruling and determine whether the court erred in denying the motion. Accordingly, since the late transcript is indispensable to resolving this final assignment of error, the assignment of error is waived. *See* Rule 5A:8(b)(4)(ii).

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[4] Sixty days from October 25, 2023, fell on December 24, a Sunday. The courts of the Commonwealth were closed on December 25 and 26. Therefore, Reynolds had until December 27 to file his transcript. *See* Code § 1-210(B) (governing the timing for filing when a deadline falls on a Saturday, Sunday, or other day when a court is closed).

- 13 -